# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No. 07-00087-01/07-CR-W-NKL |
| ) | |
| Plaintiff, ) | **COUNT 1:** |
| ) | **Defendants 1, 2, 3, 4, and 5** |
| v. ) | **18 U.S.C. § 371** |
| ) | (Conspiracy to Violate the International |
| ISLAMIC AMERICAN RELIEF AGENCY,) | Emergency Economic Powers Act and the |
| a/k/a Islamic African Relief Agency-USA, ) | Iraqi Sanctions Regulations) |
| a/k/a IARA, (1) ) | |
| ) | NMT 5 years imprisonment |
| MUBARAK HAMED, (2) ) | NMT $250,000 fine |
| [DOB: 11/03/1956], ) | NMT 3 years Supervised Release |
| ) | Class D Felony |
| ALI MOHAMED BAGEGNI, (3) ) | |
| [DOB: 01/27/1954], ) | **COUNTS 2 through 12:** |
| ) | **Defendants 1, 2, 3, and 5** |
| AHMAD MUSTAFA, (4) ) | **50 U.S.C. §§ 1701 – 1706** |
| a/k/a Abu Omar, ) | **18 U.S.C. § 2** |
| a/k/a Ahmad Al-Katib, ) | **31 C.F.R. § 575.210** |
| [DOB: 09/15/1952], ) | (Violations of the International Emergency |
| ) | Economic Powers Act and the Iraqi |
| KHALID AL-SUDANEE, (5) ) | Sanctions Regulations) |
| [DOB: 12/15/1951], ) | |
| ) | NMT 12 years imprisonment |
| ABDEL AZIM EL-SIDDIG, (6) ) | NMT $1,000,000 fine |
| a/k/a Abdel Azim El-Siddiq, ) | NMT 3 years Supervised Release |
| [DOB: 01/01/1957], ) | Class C Felony |
| ) | |
| and ) | **COUNT 13:** |
| ) | **Defendants 1, 2, 3, 4, and 5** |
| MARK DELI SILJANDER, (7) ) | **18 U.S.C. § 1956(h)** |
| [DOB: 06/11/1951], ) | (Conspiracy to Commit Money |
| ) | Laundering) |
| Defendants. ) | |
| ) | NMT 20 years imprisonment |
| ) | NMT $500,000 fine |
| ) | NMT 5 years Supervised Release |
| ) | Class B Felony |

|   |   |
|---|---|
| ) | **COUNTS 14 through 24:** |
| ) | **Defendants 1, 2, 3, and 5** |
| ) | **18 U.S.C. §§ 1956(a)(2)(A) and 2** |
| ) | (Money Laundering) |
| ) |   |
| ) | NMT 20 years imprisonment |
| ) | NMT $500,000 fine |
| ) | NMT 5 years Supervised Release |
| ) | Class B Felony |
| ) |   |
| ) | **COUNT 25 through 27:** |
| ) | **Defendants 1, 2, and 3** |
| ) | **18 U.S.C. §§ 641 and 2** |
| ) | (Theft of Public Money) |
| ) |   |
| ) | NMT 10 years imprisonment |
| ) | NMT $250,000 fine |
| ) | NMT 3 years Supervised Release |
| ) | Class C Felony |
| ) |   |
| ) | **COUNT 28:** |
| ) | **Defendants 1, 2, 3, 6, and 7** |
| ) | **18 U.S.C. § 1956(h)** |
| ) | (Conspiracy to Commit Money |
| ) | Laundering) |
| ) |   |
| ) | NMT 20 years imprisonment |
| ) | NMT $500,000 fine |
| ) | NMT 5 years Supervised Release |
| ) | Class B Felony |
| ) |   |
| ) | **COUNTS 29 through 31:** |
| ) | **Defendants 1, 2, 3, 6 and 7** |
| ) | **18 U.S.C. §§ 1956(a)(1)(B)(i) and 2** |
| ) | (Money Laundering) |
| ) |   |
| ) | NMT 20 years imprisonment |
| ) | NMT $500,000 fine |
| ) | NMT 5 years Supervised Release |
| ) | Class B Felony |

2

|   |   |
|---|---|
| ) | **COUNT 32:** |
| ) | **Defendant 7** |
| ) | **18 U.S.C. §§ 1503(a) and 1512(i)** |
| ) | (Obstuction of Justice) |
| ) | |
| ) | NMT 10 years imprisonment |
| ) | NMT $250,000 fine |
| ) | NMT 3 years Supervised Release |
| ) | Class C Felony |
| ) | |
| ) | **COUNT 33:** |
| ) | **Defendants 1 and 2** |
| ) | **26 U.S.C. § 7212(a)** |
| ) | (Obstructing or Impeding Administration |
| ) | of Internal Revenue Laws) |
| ) | |
| ) | NMT 3 years imprisonment |
| ) | NMT $250,000/$500,000 fine |
| ) | NMT 1 year Supervised Release |
| ) | Class E Felony |
| ) | |
| ) | **COUNTS 34 through 41:** |
| ) | **Defendants 1 and 2** |
| ) | **50 U.S.C. §§ 1701 – 1706** |
| ) | **18 U.S.C. § 2** |
| ) | **31 C.F.R. § 594.204** |
| ) | (Violations of the International Emergency |
| ) | Economic Powers Act and the Terrorism |
| ) | Sanctions Regulations) |
| ) | |
| ) | NMT 10 years imprisonment |
| ) | NMT $50,000 fine |
| ) | NMT 3 years Supervised Release |
| ) | Class C Felony |
| ) | |
| ) | Each Count:  $100 Special Assessment |
| ) | |
| ) | **FORFEITURE ALLEGATION:** |
| ) | **All Defendants** |
| ) | **18 U.S.C. §§ 982(a)(1) and (b)(1)** |

3

Summary of Charges:

| DEFENDANT | COUNTS |
|---|---|
| ISLAMIC AMERICAN RELIEF AGENCY, (1) | 1 - 31, 33, Forfeiture Allegation |
| MUBARAK HAMED, (2) | 1 - 31, 33 - 41, Forfeiture Allegation |
| ALI MOHAMED BAGEGNI, (3) | 1 - 31, Forfeiture Allegation |
| AHMAD MUSTAFA, (4) | 1, 13, Forfeiture Allegation |
| KHALID AL-SUDANEE, (5) | 1 - 24, Forfeiture Allegation |
| ABDEL AZIM EL-SIDDIG, (6) | 28 - 31, Forfeiture Allegation |
| MARK DELI SILJANDER, (7) | 28 - 32, Forfeiture Allegation |

## SECOND SUPERSEDING INDICTMENT

The Grand Jury charges:

### Introduction

At all times material herein:

1.    From in or about 1991 to at least in or about 2005, and at other times set forth below, **ISLAMIC AMERICAN RELIEF AGENCY**, **MUBARAK HAMED**, **ALI MOHAMED BAGEGNI**, **AHMAD MUSTAFA**, **KHALID AL-SUDANEE**, **ABDEL AZIM EL-SIDDIG**, and **MARK DELI SILJANDER**, the defendants herein, alone and in combination, did scheme, plan, conspire with, and aid and abet each other, in ways made more definite below, to violate certain criminal laws, and to conceal the violations.

4

**The Defendant IARA**

2.      The defendant **ISLAMIC AMERICAN RELIEF AGENCY**, hereinafter referred to as "**IARA**," a/k/a **Islamic African Relief Agency-USA**, was an Islamic charitable organization incorporated under Missouri law in 1985.  Originally, IARA was incorporated under the name "Islamic African Relief Agency-USA."  The central offices of IARA were located in Columbia, Missouri.

3.      On its application for tax-exempt status, IARA stated:  "The primary purpose in forming the organization was to raise funds in the United States that could be donated abroad to assist in the famine crises in Africa, particularly in the Sudan region.  The organization  raises its funds in the United States primarily through personal contacts of the organization with other foreigners living in the U.S."

4.      According to the defendant IARA's website (as of May 10, 2004), "[t]he Islamic American Relief Agency is an American non-profit organization established in 1985 and dedicated to the empowerment of disadvantaged people everywhere through relief and participatory development programs emphasizing human dignity, self-reliance, and social justice."

5.      On or about August 27, 1987, the defendant IARA applied for recognition of tax exemption under Section 501(c)(3) of the Internal Revenue Code (Title 26, United States Code).  On April 21, 1989, IARA was granted tax-exempt status.  In addition to affecting the organization's tax liability, the tax-exempt designation allowed all contributions made to the organization to be deducted from the donors' adjusted gross income.

5

6.      On its IRS Form 1023, Application for Recognition of Exemption, dated August 27, 1987, the defendant IARA stated that it "is an affiliate of the African Relief Agency of Khartoum, Sudan, although the Agency in Khartoum exercises no authority or control over the organization [IARA]."

7.      The defendant IARA's Rider to its Articles of Incorporation, submitted to the IRS on or about April 13, 1989, described it as "Islamic African Relief Agency United States Affiliate" and included the purpose of "effecting the Objectives and Means of the Islamic African Relief Agency as set forth in its Constitution."   The Rider to the Articles of Incorporation further provided that in the event of IARA's dissolution, the Islamic African Relief Agency (Sudan), among others, should receive its assets.

8.      On April 18, 1990, Dr. Abdallah Sulayman Al-Awad, Agency General Director of the Islamic African Relief Agency, Khartoum, Sudan, sent to Columbia, Missouri, a communication to the defendant IARA's then-office manager, Muhammad Ahmad Ibrahim Al-Bashir, advising the defendant IARA that the Islamic African Relief Agency headquarters in Khartoum, Sudan, had decided to transfer Mubarak Hamad [the defendant MUBARAK HAMED] to the "US office as deputy to the office manager - starting the beginning of October 1990 A.D."  The communication continued by stating, ". . . I request that you kindly start in the proceedings of his entry to the US, providing that he enters and lives on a student visa until he receives the permanent work visa."

9.      In 1998, during correspondence with the Treasury Department, the defendant IARA described the Islamic African Relief Agency as its "partner in Sudan."

6

10. On May 25, 2000, the Islamic African Relief Agency-USA legally changed its name to the Islamic American Relief Agency.

11. Internationally, the Islamic African Relief Agency headquartered in Khartoum, Sudan, was known as ISRA. ISRA's publications and correspondence confirmed the merged identity by referring to itself by both names.

12. The defendant IARA provided a large amount of its financial aid through the offices of the Islamic Relief Agency (ISRA), located throughout the world, including Amman, Jordan, and Peshawar, Pakistan.

13. The defendant IARA raised funds throughout the United States and elsewhere by various means, including appeals for charitable donations and participation in grants. IARA solicitations for charitable donations included presentations at mosques and Islamic community centers, fund-raising letters sent to donors and potential donors, publications and newsletters mailed to donors and potential donors, direct appeals to donors and potential donors, and information posted on IARA's website, accessible to the general public.

14. On October 13, 2004, IARA along with five of its overseas representatives, was designated a Specially Designated Global Terrorist (SDGT) by the Office of Foreign Assets Control in the Department of the Treasury (OFAC). From that point, IARA could no longer receive contributions or use any of its property.

7

## The Individual Defendants

15. The defendant **MUBARAK HAMED** was the executive director for the defendant IARA beginning in at least 1992, continuing until the organization's closure in October 2004. He was transferred to Columbia, Missouri, in about 1990. Defendant HAMED ran the day-to-day operations of IARA, and was responsible for implementing the projects IARA started, or with which it associated itself. HAMED spoke for IARA, negotiated and entered cooperation agreements and contracts on its behalf, and authorized spending and payment for projects, materials, and travel.

16. The defendant **ALI MOHAMED BAGEGNI** was a member of the defendant IARA's board of directors beginning in at least 1992, continuing until the organization's closure in October 2004. At all times material, he was a signatory authority for checks and wire transfers, including most of the financial transactions set forth below, and others, which violated the Iraqi Sanctions Regulations and various Executive Orders, described more fully below, which constituted the theft of government money, and constituted the laundering of money by various means.

17. The defendant **KHALID AL-SUDANEE** was the regional director of ISRA's Middle East office, located in Amman, Jordan. Defendant SUDANEE was the facilitator who actually moved the money and goods which IARA provided him for use in Iraq to Iraq. He communicated with IARA about his efforts on their behalf in Iraq, and also communicated with persons involving government and military in Iraq on behalf of IARA. On October 13, 2004, SUDANEE was designated as a SDGT by OFAC.

8

18.     The defendant **AHMAD MUSTAFA**, **a/k/a Abu Omar**, **a/k/a Ahmad Al-Katib**, a native of Iraq, was a fund-raiser for the defendant IARA from approximately July 1996 until the organization's closure in October 2004.  In his capacity as a fund-raiser for IARA, Defendant MUSTAFA traveled throughout the United States soliciting charitable contributions. Defendant MUSTAFA concentrated his efforts in raising funds for use in Iraq, and traveled to Iraq on behalf of the defendant IARA while the Iraqi Sanctions Regulations more fully described below, were in effect.

19.     The defendant **ABDEL AZIM EL-SIDDIG**, **a/k/a Abdel Azim El-Siddiq**, was a fund-raiser for the defendant IARA, and has been described as its Vice-President for International Operations.  On or about November 1, 2003, he opened one of the defendant IARA's bank accounts at LaSalle Bank, Chicago, Illinois, on which he had signatory authority, identifying himself as President of IARA and his wife as Secretary of IARA.  This account was used to transfer funds from the defendant IARA to the defendant MARK DELI SILJANDER.

20.     The defendant **MARK DELI SILJANDER** was a former member of the United States House of Representatives, and owner/director of a consulting firm, Global Strategies, Inc., a planning, marketing and public relations company incorporated in Virginia. Defendant SILJANDER, a friend of the defendant ABDEL AZIM EL-SIDDIG, was hired to advocate for IARA's removal from a Senate Finance Committee list of charitable organizations suspected of being involved in supporting international terrorism, and its

reinstatement as an approved government contractor after having been terminated as is alleged more specifically below.

**USAID Grants to IARA**

21.     The defendant IARA also received funds for its activities in the form of government cooperation agreements and grants.  Beginning on or about January 1, 1997, the defendants IARA, MUBARAK HAMED, ALI MOHAMED BAGEGNI and others known and unknown to the Grand Jury, entered into a series of written cooperative agreements with the United States Agency for International Development (USAID), an agency within the United States Department of State, for relief projects in Mali, Africa.  The agreements were terminated by USAID on or about December 19, 1999.  At the time of termination, the amount of money involved in the cooperative agreements totaled approximately $2,000,000.00.

22.     By the terms of each cooperative agreement, the defendant IARA could not co-mingle USAID program funds with other money, and was required to separately track USAID contributions to the program.  The defendant IARA opened special and exclusive accounts for each project, which detailed the financial transactions related to the respective cooperative agreement.  Additionally, the defendant IARA was obligated by the terms of the agreements to provide a specified percentage of matching funds, ranging from approximately 13 - 26 percent of USAID applied funds.  The defendant IARA failed to fully fund the required percentage of matching contributions.

10

23.     Subsequent to the termination of the agreements, the defendant IARA was authorized to request and expend USAID funds to pay for outstanding invoices obligated during the existence of the agreements, and specifically related to projects authorized within the terms of the agreements.

24.     After all outstanding invoices were satisfied, the defendants IARA, MUBARAK HAMED and ALI MOHAMED BAGEGNI, without authorization, retained approximately $84,922.00 of USAID money and failed to return the unexpended funds to USAID as required by the terms and rules related to the agreements.

25.     After the December 20, 1999, termination of the defendant IARA's cooperative agreement with USAID, the defendant IARA was debarred from any procurement transactions with any part of the Executive Branch of the United States Government.  IARA was informed that, in part, its termination and debarment was due to a determination that continuing the grant was not in the national interest of the United States.

26.     The defendant MARK DELI SILJANDER was informed of the basis for the debarment, and in or about March 2004 was hired by the defendants IARA, MUBARAK HAMED, ALI MOHAMED BAGEGNI,  ABDEL AZIM EL-SIDDIG and other known and unknown conspirators, in part, to attempt to have the debarment lifted.  Thereafter, Defendant SILJANDER contacted various persons regarding the reasons for the debarment, including an employee of USAID.

11

### IARA's Placement on the United States Senate Finance Committee List

27.     On or about January 14, 2004, it was announced that the defendant IARA was included on a United States Senate Finance Committee list (hereinafter "the list") targeting the activities of Section 501(c)(3) organizations suspected of being involved in supporting international terrorism.

28.     In or around March 2004, the defendants IARA, MUBARAK HAMED, ALI MOHAMED BAGEGNI, ABDEL AZIM EL-SIDDIG and others known and unknown to the Grand Jury, hired the defendant MARK DELI SILJANDER, in part, to advocate for IARA's removal from "the list" and reinstatement as an approved government contractor, by gathering information and meeting with individuals and agencies of the United States Government, for which IARA paid Defendant SILJANDER at least $75,000.00.

### IEEPA and the Iraqi Sanctions Regulations

29.     Under the International Emergency Economic Powers Act (Title 50, United States Code, Sections 1701 through 1706) (IEEPA), the President of the United States had the authority to deal with unusual or extraordinary threats to the national security and foreign policy of the United States. This authority included investigating, regulating and prohibiting any transaction, including transfers of credit or payments, involving any interest of a foreign country or national thereof related to a Presidentially declared national emergency. The President's formal directives in this regard were issued through Executive Orders which had the force and effect of law.

30.     On or about August 2, 1990, under the authority of IEEPA, and following Iraq's invasion of Kuwait, President George H. W. Bush issued Executive Order 12722, which declared a national emergency with respect to Iraq.  According to the directive, the policies and actions of the Government of Iraq constituted an unusual and extraordinary threat to the national security and foreign policy interests of the United States.  On or about August 9, 1990, the President issued Executive Order 12724, which prohibited specific conduct related to the national security concerns and empowered the Secretary of Treasury to promulgate regulations and take other action necessary to fully realize the purposes of the relevant Executive Orders.

31.     Pursuant to this authority, the Secretary of Treasury issued the Iraqi Sanctions Regulations, Title 31, Code of Federal Regulations, Section 575.  These Executive Orders and regulations, which are administered and enforced by the Department of Treasury's Office of Foreign Assets Control (OFAC), prohibited, among other things:  (a) the unauthorized transfer, direct or indirect, of funds or other financial or economic resources to the Government of Iraq or to any person in Iraq; (b) the unauthorized export of goods, technology or services from the United States to a third country that were intended for further shipment to Iraq; (c) any transaction for the purpose of, or which had the effect of, evading or avoiding the Iraqi Sanctions Regulations; (d) unauthorized travel to Iraq by United States persons, including permanent resident aliens; and (e) any conspiracy formed for the purpose of engaging in a transaction prohibited by the regulations.

13

32.     The regulations did, however, provide for the registration and licensing of Non-Governmental Organizations (NGOs) engaged in humanitarian activities in Iraq, as well as individual transactions; all of which were reviewed on a case-by-case basis by OFAC.  If approved, the NGO or other applicant would receive a license from OFAC containing strict guidance on the nature and extent of the approved activities.  None of the defendants ever received a license from OFAC authorizing money or other items to be delivered, directly or indirectly, into Iraq.

33.     The President renewed the declared national emergency regarding Iraq by the yearly reissuance of the relevant Executive Orders.  Effective May 23, 2003, subsequent to the ouster of the Ba'ath party and the regime of then-President Saddam Hussein, OFAC issued a General License which suspended most economic sanctions against Iraq, including those described herein.

34.     At no time material did any of the defendants, IARA, MUBARAK HAMED, ALI MOHAMED BAGEGNI, AHMAD MUSTAFA and KHALID AL-SUDANEE, receive a license or other authorization from OFAC to transfer or cause to be transferred, monies or other items, into Iraq, or to travel to Iraq.

35.     As is more fully detailed below, between approximately March 1991 and May 2004, the defendants IARA, MUBARAK HAMED, KHALID AL-SUDANEE, ALI MOHAMED BAGEGNI, AHMAD MUSTAFA, and others, conspired to violate the Iraqi Sanctions Regulations, by knowingly transferring and attempting to transfer funds from the United States to Iraq, by and through Amman, Jordan.  During this time, all of the defendants

14

named in this Indictment attempted to conceal and disguise these violations through various false statements and filings, and expenditures.

### IEEPA, Gulbuddin Hekmatyar and the Shamshatu Refugee Camp

36.     Under the International Emergency Economic Powers Act (Title 50, United States Code, Sections 1701 through 1706) (IEEPA), the President of the United States has the authority to deal with unusual or extraordinary threats to the national security and foreign policy of the United States.  The President deals with these unusual or extraordinary threats, in part, through Executive Orders which have the force and effect of law.

37.     On September 23, 2001, President George W. Bush issued Executive Order 13224, which declared a national emergency following the events of September 11, 2001, regarding organizations and individuals identified as Specially Designated Global Terrorists (SDGTs), who commit, threaten to commit, or support acts of terrorism that threaten the security of United States nationals or the national security, foreign policy, or economy of the United States.  Included in an Annex to the Executive Order were specific names of groups and individuals designated by the President pursuant to the Order.  Additionally, Executive Order 13224 authorized the Secretary of the Treasury, in consultation with the Secretaries of State and Homeland Security, and the Attorney General, to designate groups and individuals determined by the Secretary of the Treasury to be engaged in acts of terrorism which fall within the purposes of Executive Order 13224.

38.     In order to enforce the directives of the Executive Order, the Secretary of the Treasury was authorized by the President to promulgate sanctions regulations which

15

specifically proscribed conduct related to SDGTs.  Pursuant to the sanctions regulations, no person subject to United States jurisdiction was permitted to engage in any transaction with, or otherwise deal in any property or interest in property of, any group or individual whose property or interests in property are blocked pursuant to Executive Order 13224 and Title 31, Code of Federal Regulations, Section 594.201(a).

39.     Gulbuddin Hekmatyar founded Afghanistan's Hezbi Islami Party, also called Hezb-e-Islami-Gulbuddin (HIG), in about 1976, when in exile in Pakistan.  In the 1980s,  he was a rebel (mujahideen) military commander in the war with Soviets in Afghanistan.  He also commanded forces in the subsequent Afghan civil war.  Hekmatyar served as Prime Minister of Afghanistan for periods in 1992 and in 1996.  He fled the country in 1996, when the Taliban took control of Kabul.  Since 2000, Hekmatyar supported various terrorist acts conducted by al-Qa'ida, the Taliban and others, in Pakistan and elsewhere.  Hekmatyar vowed to engage in a holy war against the United States and international troops in Afghanistan.  In December 2002, he issued a message that read:  "Hezb-e-Islami will fight our jihad until foreign troops are gone from Afghanistan and Afghans have set up an Islamic government."  On February 19, 2003, the United States Government designated Hekmatyar as an SDGT because "[t]he U.S. Government has information indicating that Gulbuddin Hekmatyar has participated in and supported terrorist acts committed by al-Qa'ida and the Taliban."

40.     The Shamshatu refugee camp was founded in or about 1978 by Gulbuddin Hekmatyar with a 1000-acre land grant from the government of Pakistan.  Shamshatu

16

contained approximately 300,000 homes for Afghanistan refugees. The HIG had four office complexes in Shamshatu near Gulbuddin Hekmatyar's home, which was located near the center of the Shamshatu camp. On or about July 15, 2003, the defendants IARA and MUBARAK HAMED entered into a written contract with a representative of Hekmatyar to fund the operation of an "orphanage," as that term is understood in Pakistan, located in Shamshatu camp.

41. As is more fully detailed below, between in or about March 2003 and in or about August 2004, the defendants IARA and MUBARAK HAMED engaged and attempted to engage in financial transactions and otherwise dealt and attempt to deal in property and interests in property of and for the benefit of Gulbuddin Hekmatyar, an SDGT, in violation of the Executive Orders discussed in this section of the Indictment, by sending, and causing to be sent, approximately one hundred thirty thousand dollars ($130,000.00) to ISRA bank accounts in Peshawar, Pakistan, to renovate buildings located in the Shamshatu camp, which were owned and controlled by SDGT Gulbuddin Hekmatyar.

**Other Criminal Acts**

42. As is more fully detailed below, from at least 1991 until in or about 2005, and at other times the defendants ISLAMIC AMERICAN RELIEF AGENCY, MUBARAK HAMED, ALI MOHAMED BAGEGNI, AHMAD MUSTAFA, KHALID AL-SUDANEE, ABDEL AZIM EL-SIDDIG, and MARK DELI SILJANDER, alone and in combination, took efforts to hide, disguise and conceal their unlawful acts, charged and uncharged, including making false and misleading verbal and written statements to, among others,

17

government agencies including, but not limited to the Internal Revenue Service, and OFAC, and stealing government funds in order to pay for the activities which Defendant SILJANDER would take on IARA's behalf.

### The Financial Institutions

43.     At all times material, LaSalle Bank, First National Bank, First Virginia Bank, Centerre Bank, Nation's Bank, Boone County National Bank, Boatmen's Bank, Bank of America, Branch Bank and Trust, James Monroe Bank, and Merrill Lynch were all located within the United States and were all financial institutions as defined in section 5312(a)(2) of Title 31, United States Code.

### COUNT ONE
(Conspiracy to Violate the International Emergency Economic Powers Act
and the Iraqi Sanctions Regulations)

44.     The allegations of paragraphs 2 through 35, 42, and 43 of this Indictment are re-alleged and incorporated by reference as though fully set forth again.

45.     Beginning in or around March 1991, and continuing until in or around May 2005, in the Western District of Missouri, and elsewhere, the defendants **IARA**, **MUBARAK HAMED**, **KHALID AL-SUDANEE**, **ALI MOHAMED BAGEGNI**, **AHMAD MUSTAFA**, and others known and unknown to the Grand Jury, knowingly and willfully conspired, confederated and agreed to violate Executive Orders 12722 and 12724 and the Iraqi Sanctions Regulations, by transferring, attempting to transfer and causing to be transferred, funds, from the United States to Iraq, by and through Amman, Jordan, which transfers were subject to Executive Orders 12722 and 12724 and the Iraqi Sanctions

18

Regulations, in violation of Title 50, United States Code, Sections 1701 through 1706; and Title 31, Code of Federal Regulations, Section 575.210.

**<u>The Object, Manner and Means of the Conspiracy</u>**

46.     It was the object of the conspiracy to collect and attempt to collect money and funds within the United States for use in and transfer to Iraq, and to distribute and attempt to distribute money and funds collected in the United States to persons and entities within Iraq.

47.     In furtherance of the conspiracy, beginning in or around March 1991, the defendant IARA, by and through its board of directors, including the defendant ALI MOHAMED BAGEGNI, authorized the provision of financial support to persons and organizations located inside Iraq.

48.     During the course and in furtherance of the conspiracy, and in order to generate donations for Iraq and elsewhere, the defendants made appeals for charitable donations. IARA participated in grants or cooperative agreements with USAID and others in order to maximize the use of charitable donations, including the use of general donations in Iraq.  In order to generate donations, IARA used the defendants and others to solicit funds through presentations at mosques and Islamic community centers, fund-raising letters sent to donors and potential donors, publications and newsletters mailed to donors and potential donors, direct appeals to donors and potential donors, and information posted on IARA's website, accessible to the general public.  In order  inform donors of  IARA's efforts and use of funds in Iraq, the defendants also used the above-listed methods.

19

49. During the course and in furtherance of the conspiracy, and in order to generate money for use in Iraq, the defendants IARA, MUBARAK HAMED, ALI MOHAMED BAGEGNI, and AHMAD MUSTAFA used IARA's tax-exempt status to solicit donations from the public by representing that the donors' contributions were tax deductible.

50. During the course and in furtherance of the conspiracy, and in order to conceal the unlawful endeavor, the defendants attempted to avoid detection by routing the money and transactions indirectly to Iraq.

51. During the course and in furtherance of the conspiracy, and in order to maximize the amount and use of its charitable donations, to maintain its tax-exempt status, to avoid detection of its projects and the use of its funds in Iraq, and to regain its ability to participate in government grants and cooperative agreements, the defendants knowingly made false and misleading statements to various governmental agencies and others, and stole and misused government funds.

52. During the course and in furtherance of the conspiracy, the defendants IARA, MUBARAK HAMED, ALI MOHAMED BAGEGNI and AHMAD MUSTAFA engaged the services of the defendant KHALID AL-SUDANEE, regional director of ISRA's Middle East office, to transfer, by electronic and other means, funds or other items originating in the United States to Iraq. As part of his duties, and in order to facilitate the transactions and identify recipients and projects for IARA, Defendant AL-SUDANEE met with Iraqi military and other government officials, and with persons sent to Jordan and elsewhere by IARA.

20

53.     During the course and in furtherance of the conspiracy, the defendants MUBARAK HAMED, ALI MOHAMED BAGEGNI and AHMAD MUSTAFA knowingly transferred and caused to be transferred, funds from the defendant IARA's bank accounts in the Western District of Missouri to ISRA's bank accounts in Amman, Jordan, controlled by the defendant KHALID AL-SUDANEE, who, by and in agreement with other defendants, knowing that such transfers were in violation of the Iraqi Sanctions Regulations, transferred and caused to be transferred, these monies and materials to Iraq.

54.     During the course and in furtherance of the conspiracy, the defendant KHALID AL-SUDANEE authored and maintained internal reports and financial schedules detailing monies and funds transferred and sent from the United States by IARA to him for use in and for Iraq.  Copies of these reports were periodically forwarded to IARA and other defendants.

**Overt Acts**

55.     During the course and in furtherance of the conspiracy, and in order to accomplish its aims and purposes, there was committed by one or more of the conspirators, known and unknown, at locations in the Western District of Missouri and elsewhere, at least one of the following overt acts:

A - X.  On or about each of the dates set forth below, the transfer and attempted transfer of funds and other items set forth below was made from the Western District of Missouri to Aman, Jordan, for ultimate distribution to Iraq:

21

| OVERT ACT | DATE OF TRANSFER | APPROXIMATE AMOUNT |
|---|---|---|
| A | 04/10/91 | $ 15,542.50 |
| B | 08/26/91 | $ 19,200.00 |
| C | 03/26/92 | $ 15,000.00 |
| D | 07/28/92 | $ 4,742.50 |
| E | 06/11/93 | $ 6,981.00 |
| F | 05/31/95 | $ 4,120.00 |
| G | 07/26/96 | $ 10,000.00 |
| H | 11/20/96 | "Medical Supplies" |
| I | 12/10/96 | $ 14,529.00 |
| J | 01/28/97 | $ 41,700.00 |
| K | 03/31/97 | $ 51,500.00 |
| L | 01/29/98 | $ 50,000.00 |
| M | 12/09/99 | $ 8,801.00 |
| N | 01/04/00 | $ 30,000.00 |
| O | 01/14/00 | $ 50,000.00 |
| P | 02/08/00 | $ 75,000.00 |
| Q | 05/12/00 | $ 58,995.00 |
| R | 10/31/00 | $ 60,000.00 |
| S | 02/07/01 | $ 50,000.00 |
| T | 02/14/01 | $ 50,000.00 |
| U | 07/19/01 | $ 50,000.00 |
| V | 12/18/01 | $ 40,974.09 |
| W | 05/24/02 | $ 5,776.00 |
| X | 08/29/02 | $ 4,829.00 |

Case 4:07-cr-00087-NKL    Document 135    Filed 10/21/08    Page 22 of 50

Y - AA. The theft of public money counts as alleged in Counts Twenty-Five (25) through Twenty-Seven (27), inclusive, are incorporated herein and re-alleged as separate overt acts as if fully set forth again.

BB - DD. The money laundering counts as alleged in Counts Twenty-Nine (29) through Thirty-One (31), inclusive, are incorporated herein and realleged as separate overt acts as if fully set forth again.

EE - SS. The acts alleged in subparagraphs A through O of Count Thirty-Three (33), paragraph 77, inclusive, are incorporated herein and re-alleged as separate overt acts as if fully set forth again.

TT. On April 18, 1990, Dr. Abdallah Sulayman Al-Awad, Agency General Director of the Islamic African Relief Agency, Khartoum, Sudan, sent to Columbia, Missouri, a communication to the defendant IARA's then-office manager, Muhammad Ahmad Ibrahim Al-Bashir, advising the defendant IARA that the Islamic African Relief Agency headquarters in Khartoum, Sudan, had decided to transfer Mubarak Hamad [the defendant MUBARAK HAMED] to the "US office as deputy to the office manager - starting the beginning of October 1990 A.D." The communication continued by stating, ". . . I request that you kindly start in the proceedings of his entry to the US, providing that he enters and lives on a student visa until he receives the permanent work visa."

UU. On or about November 12, 1991, the defendant MUBARAK HAMED mailed a letter to a charity in Canada, describing IARA's efforts in Iraq, and efforts at raising money for use in Iraq.

VV. On or about December 23, 1998, the defendant KHALID AL-SUDANEE mailed a letter to the defendant MUBARAK HAMED, describing work done in Iraq and military

23

efforts of the United States in Iraq. The letter stated that an Iraqi military commander appeared at the opening of an IARA-funded school, and included photographs.

WW. On or about February 18, 1999, the defendant KHALID AL-SUDANEE mailed a letter to the defendant MUBARAK HAMED, describing the status of work done in Iraq, and requesting continued support.

XX. Between approximately 1991 and in or about April 2004, publications were produced and distributed throughout the United States, which described conditions in Iraq, and solicited and lauded contributions going to Iraq. Frequently, these publications claimed the conditions were due to the sanctions imposed upon Iraq.

YY. Between in or about 1991 and in or about April 2004, publications were produced and distributed to keep contributors and donors up to date on IARA's efforts in Iraq, and to encourage the contributors to continue to give money to IARA. Some of the publications showed the percentage of IARA's funds that went to Iraq, and described the claimed use of some of the funds. The publications also detailed travel by one of the defendants to Iraq, in violation of the sanctions.

ZZ. Between in or about 1991 and on or about October 13, 2004, internal accounting classifications were prepared and maintained, which detailed the nature and amount of contributions being made for use in Iraq.

AAA. Between in or about 1992 and on or about October 13, 2004, the defendant IARA's board of directors, including the defendant ALI MOHAMED BAGEGNI, reviewed and approved the defendant IARA's annual reports, which described the defendant IARA's activities in Iraq. The annual reports and other literature were sent out to solicit and encourage donations in order to facilitate the defendant IARA's ongoing efforts within Iraq.

24

BBB.  Between in or around June 1999 and in or around October 1999, the defendant AHMAD MUSTAFA, a/k/a Ahmad Al-Katib, traveled to Iraq as a representative of the defendant IARA.

CCC.  In or around 2000, the defendant AHMAD MUSTAFA traveled to at or near Duhouk, Iraq, as a representative of the defendant IARA.

DDD.  In or around 2001, the defendant AHMAD MUSTAFA traveled to at or near Duhouk, Iraq, as a representative of the defendant IARA.

EEE.  In or about January, 2001, a website was operated which, in part, solicited donations for IARA projects in Iraq.

FFF.  On or about August 17, 2001, in response to OFAC letters of March 21, 2001, and August 1, 2001, noting that (a) the IARA website stated that the organization was active in both Sudan and Iraq, (b) IARA-USA's application for a license to send merchandise to Sudan was denied, and (c) Islamic Relief Agency, which listed IARA-USA as one of its major donors, was also denied a license to send merchandise to Sudan, and requesting, within 20 days, a report of IARA-USA's activities in Sudan and Iraq within the preceding five years,  the defendants IARA and MUBARAK HAMED sent a letter to OFAC in which they claimed that "IARA-USA [the defendant IARA] is an independent U.S. non-profit corporation that is separate and distinct from any other organization outside U.S. that may use IARA or any portion of this name in its title," and in which he stated that IARA did not export any merchandise to Iraq and was only "trying to help Iraqi people outside Iraq."

GGG.  In or about March and April 2004, the defendant MUBARAK HAMED hired MARK DELI SILJANDER, not named as a defendant in this Count, to advocate for IARA's removal from a Senate Finance Committee list of charitable organizations suspected of being

25

involved in supporting international terrorism, and its reinstatement as an approved government contractor after its termination by USAID.

HHH.  On or about April 28, 2004, the defendants MUBARAK HAMED, ALI MOHAMED BAGEGNI, and IARA, and ABDEL AZIM EL-SIDDIG (not a defendant in this count) agreed with MARK DELI SILJANDER (not a defendant in this count) to mischaracterize his efforts and relationship with IARA.

I I I.  On or about May 18, 2004, ABDEL AZIM EL-SIDDIG paid MARK DELI SILJANDER $25,000.00, through a check, number 1005, payable to International Foundation (with the notation indicating sub-account number 600-006, Muslim Friends).

JJJ.  On or about November 13, 2004, the defendant MUBARAK HAMED executed and swore to an affidavit stating, in part, that IARA was a completely separate organization from any other entities, that it was a self-contained legal entity and not a parent or subsidiary of any other organization, and was a completely separate organization from the Islamic African Relief Agency in Sudan.

All in violation of Title 18, United States Code, Section 371; Title 50, United States Code, Sections 1701-1706; and Title 31, Code of Federal Regulations, Section 575.210.

### COUNTS TWO through TWELVE
(Violations of the International Emergency Economic Powers Act
and the Iraqi Sanctions Regulations)

56.  The allegations of paragraphs 44 through 55 of this Indictment are re-alleged and incorporated by reference as though fully set forth again.

57.  On or about the dates, and in the approximate amounts, set forth below, in the Western District of Missouri, and elsewhere, the defendants **IARA**, **MUBARAK HAMED**,

26

**ALI MOHAMED BAGEGNI** and **KHALID AL-SUDANEE**, aided and abetted by each other, knowingly and willfully violated Executive Orders 12722 and 12724 and the Iraqi Sanctions Regulations, by participating in transactions involving the transfer and attempted transfer of funds from the United States to Iraq, by and through Amman, Jordan, which funds were subject to Executive Orders 12722 and 12724 and the Iraqi Sanctions Regulations:

| COUNT | DATE OF TRANSFER | APPROXIMATE AMOUNT |
|---|---|---|
| 2 | 12/09/99 | $ 8,801.00 |
| 3 | 01/04/00 | $ 30,000.00 |
| 4 | 01/14/00 | $ 50,000.00 |
| 5 | 02/08/00 | $ 75,000.00 |
| 6 | 05/12/00 | $ 58,995.60 |
| 7 | 10/31/00 | $ 60,000.00 |
| 8 | 02/14/01 | $ 50,000.00 |
| 9 | 07/19/01 | $ 50,000.00 |
| 10 | 12/18/01 | $ 40,974.09 |
| 11 | 05/24/02 | $ 5,776.00 |
| 12 | 08/29/02 | $ 4,829.80 |

All in violation of Title 50, United States Code, Sections 1701-1706; Title 31, Code of Federal Regulations, Section 575.210; and Title 18, United States Code, Section 2.

### COUNT THIRTEEN
(Conspiracy to Commit Money Laundering)

58. The allegations of paragraphs 56 and 57 of this Indictment are re-alleged and incorporated by reference as though fully set forth again.

27

59.    Beginning in or about March 1991 and continuing until in or about May 2003, in the Western District of Missouri, and elsewhere, the defendants **IARA**, **MUBARAK HAMED**, **ALI MOHAMED BAGEGNI**, **AHMAD MUSTAFA** and **KHALID AL-SUDANEE** did conspire and agree with one another, and with others known and unknown to the Grand Jury, to knowingly transport, transmit and transfer, and attempt to transport, transmit and transfer monetary instruments and funds from a place in the United States to a place outside the United States with the intent to promote the carrying on of specified unlawful activity, that is, knowingly and willfully transferring and attempting to transfer funds or other financial or economic resources to Iraq, by and through Amman, Jordan, in violation of Title 50, United States Code, Sections 1701 through 1706 (IEEPA), and punishable under Section 206 of IEEPA (also known as Title 50, United States Code, Section 1705(b)).

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS FOURTEEN through TWENTY-FOUR
(Money Laundering)

60.    The allegations of paragraphs 58 and 59 of this Indictment are re-alleged and incorporated by reference as though fully set forth again.

61.    On or about the dates, and in the approximate amounts, set forth below, in the Western District of Missouri, and elsewhere, the defendants **IARA**, **MUBARAK HAMED**, **ALI MOHAMED BAGEGNI** and **KHALID AL-SUDANEE**, aided and abetted by each other, did knowingly transfer and attempt to transfer funds, in the form of wire transfers,

28

from a place in the United States to a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, that is, knowingly and willfully transferring and attempting to transfer funds or other financial or economic resources to Iraq, by and through Amman, Jordan, in violation of Title 50, United States Code, Sections 1701 through 1706 (IEEPA), and punishable under Section 206 of IEEPA (also known as Title 50, United States Code, Section 1705(b)):

| COUNT | DATE OF WIRE TRANSFER | APPROXIMATE AMOUNT |
|---|---|---|
| 14 | 12/09/99 | $   8,801.00 |
| 15 | 01/04/00 | $ 30,000.00 |
| 16 | 01/14/00 | $ 50,000.00 |
| 17 | 02/08/00 | $ 75,000.00 |
| 18 | 05/12/00 | $ 58,995.60 |
| 19 | 10/31/00 | $ 60,000.00 |
| 20 | 02/14/01 | $ 50,000.00 |
| 21 | 07/19/01 | $ 50,000.00 |
| 22 | 12/18/01 | $ 40,974.09 |
| 23 | 05/24/02 | $   5,776.00 |
| 24 | 08/29/02 | $   4,829.80 |

All in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

29

(Theft of Public Money)

62.     The allegations of paragraphs 2 through 35, 42, 43, and 45 through 55 of this Indictment are re-alleged and incorporated by reference as though fully set forth again.

63.     On or about the dates, and in the approximate amounts set forth below, the defendants **IARA**, **MUBARAK HAMED**, **ALI MOHAMED BAGEGNI** and others known and unknown to the Grand Jury, aided and abetted by each other, did knowingly and without authority, convert for their use and the use of another, money of USAID, a department or agency of the United States, that is, by providing payments derived from USAID funds to another in support of contracted efforts aimed at altering the defendant IARA's status before the United States Senate Finance Committee, and obtaining reinstatement as an approved government contractor:

| COUNT | DATE | DESCRIPTION OF TRANSACTION |
|---|---|---|
| 25 | 06/09/04 | Deposit of Check No. 7095 from IARA, USA, CEWIGAP account at Nations Bank, payable to International Foundation, for approximately $25,000.00, into Branch Bank and Trust, account number 5138683917, for credit to the sub-account of Muslim Friends, number 600-006 |
| 26 | 09/02/04 | Deposit of Check No. 7097 from IARA, USA, CEWIGAP account at Nations Bank, payable to National Heritage Foundation, for approximately $12,500.00, into James Monroe Bank, account number 5200000602, for credit to the sub-account of "Ambassaders for Peace and Reconciliation", number 1075388 |

30

| COUNT | DATE | DESCRIPTION OF TRANSACTION |
|---|---|---|
| 27 | 09/02/04 | Deposit of Check No. 1204 from IARA, USA, Mali Project account at Nation's Bank (then Boatmen's Bank), payable to National Heritage Foundation, for approximately $12,500.00, into James Monroe Bank, account number 5200000602, for credit to the sub-account "Ambassaders of Peace and Reconciliation," number 1075388 |

All in violation of Title 18, United States Code, Sections 641 and 2.

**COUNT TWENTY-EIGHT**
(Conspiracy to Commit Money Laundering)

64. The allegations of paragraphs 62 and 63 of this Indictment are re-alleged and incorporated by reference as though fully set forth again.

65. Beginning in or about March 2004, and continuing through on or about January 16, 2008, in the Western District of Missouri, and elsewhere, the defendants **IARA**, **MUBARAK HAMED**, **ALI MOHAMED BAGEGNI**, **ABDEL AZIM EL-SIDDIG** and **MARK DELI SILJANDER** did conspire and agree with one another, and with others known and unknown to the Grand Jury, to knowingly conduct and attempt to conduct financial transactions, that is, transactions involving the use of a financial institution which is engaged in and the activities of which affect interstate and foreign commerce in any way or degree, that is, the transfer and attempted transfer of funds which involved the proceeds of specified unlawful activity, that is, theft of public money, as set forth in Counts Twenty-Five (25) through Twenty-Seven (27) of this Indictment, knowing that the transactions were

31

designed in whole or in part to conceal and disguise the nature, source and ownership of the proceeds, and that, while conducting such financial transactions, knew that the funds represented the proceeds of some form of unlawful activity.

All in violation of Title 18, United States Code, Section 1956(h).

<u>**COUNTS TWENTY-NINE through THIRTY-ONE**</u>
(Money Laundering)

66. The allegations of paragraphs 64 and 65 of this Indictment are re-alleged and incorporated by reference as though fully set forth again.

67. In exchange for his services to IARA, the defendant MARK DELI SILJANDER was paid a total of approximately $75,000.00. On or about May 27, 2004, Defendant SILJANDER sent an email to the International Foundation requesting a transfer of $25,000.00 from the Muslim Friends sub-account number 600-006 to his Global Strategies sub-account number 348. Subsequently, a part of that amount, more fully described in Count Twenty-Nine (29), was transferred to Defendant SILJANDER's account at Merrill Lynch.

68. On or about the dates, and in the approximate amounts, set forth below, in the Western District of Missouri, and elsewhere, the defendants **IARA**, **MUBARAK HAMED**, **ALI MOHAMED BAGEGNI**, **ABDEL AZIM EL-SIDDIG** and **MARK DELI SILJANDER**, and others known and unknown to the Grand Jury, aided and abetted by each other, did knowingly conduct and attempt to conduct a financial transaction, that is, a transaction involving the use of a financial institution which is engaged in and the activities

32

of which affect interstate and foreign commerce in any way or degree, namely, the transfer and attempted transfer of funds which involved the proceeds of specified unlawful activity, that is, theft of public money, as set forth in Counts Twenty-Five (25) through Twenty-Seven (27) of this Indictment, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, source and ownership of the proceeds, and that, while conducting such financial transaction, knew that the funds represented the proceeds of some form of unlawful activity:

| COUNT | DATE OF TRANSFER | DESCRIPTION OF TRANSACTION |
|---|---|---|
| 29 | 06/30/04 | Deposit of automated clearing house transfer (ACH) from an International Foundation account at Branch Bank and Trust for approximately $18,337.00 to the defendant MARK DELI SILJANDER's account with Merrill Lynch, number 2AR-45S57 |
| 30 | 09/10/04 | Deposit of Check No. 71631 from National Heritage Foundation, "Ambassaders of Peace and Reconciliation" sub-account, at the James Monroe Bank, payable to Global Strategies, Inc. c/o Mark Siljander for approximately $23,000 into defendant's Branch Bank and Trust, account number 5139270128 |
| 31 | 11/23/04 | Deposit of Check No. 75141 from National Heritage Foundation, "Ambassaders of Peace and Reconciliation" sub-account, at James Monroe Bank, payable to MARK SILJANDER for approximately $1,350.00 into defendant's account with Merrill Lynch, account number 2AR-45S57 |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

33

**General Allegations**

69.     The allegations of paragraphs 66 and 67 of this Indictment are re-alleged and incorporated by reference as though fully set forth again.

70.     In or around March 2004, the defendant IARA hired the defendant MARK DELI SILJANDER, and another individual to whom the organization was referred by Defendant SILJANDER, to advocate for the defendant IARA's removal from "the list" and to assist in the reinstatement of the defendant IARA as an approved government contractor. Between approximately June and November 2004, as compensation for the services that Defendant SILJANDER agreed to perform, the defendant IARA transferred funds to sub-accounts at the National Heritage Foundation and the International Foundation, which sub-accounts were managed on behalf of Defendant SILJANDER.

71.     On October 13, 2004, pursuant to applicable Executive Orders, the Secretary of the Treasury designated various individuals and entities related to IARA and ISRA as SDGTs, including the defendant IARA and the defendant KHALID AL-SUDANEE.

72.     At all times material, a federal grand jury of the Western District of Missouri was conducting an investigation of the defendant IARA.  During this investigation, the following matters, among others, were material:

Case 4:07-cr-00087-NKL     Document 135     Filed 10/21/08     Page 34 of 50

A. Whether the defendant IARA had retained the defendant MARK DELI SILJANDER or any other individuals to perform lobbying or advocacy services;

B. Whether any individuals had performed lobbying or advocacy services on behalf of the defendant IARA;

C. Whether the defendant IARA had used funds it had received from charitable donations or USAID funds to pay for lobbying or advocacy services;

D. Whether the defendant IARA or any other individuals had engaged in monetary or financial transactions involving charitable donations or USAID funds and, if so, the nature and purpose of said transactions; and

E. What discussions had taken place between the defendant IARA and other individuals regarding lobbying and advocacy services, and monetary and financial transactions, and who had been involved in any such discussions.

### Statutory Allegations

73. Beginning on or about December 13, 2005, and continuing until at least April 26, 2007, in the Western District of Missouri, and elsewhere, the defendant **MARK DELI SILJANDER** did corruptly endeavor to obstruct and impede the due administration of justice in an investigation conducted by a federal grand jury of the Western District of Missouri by:

35

A.    On or about December 13, 2005, in Arlington, Virginia, the defendant

MARK DELI SILJANDER did knowingly and willfully make materially false, fictitious and

fraudulent statements and representations to agents of the Federal Bureau of Investigation

acting on behalf of the grand jury, to wit:

(1)    he had not been hired to do any lobbying or advocacy for the

defendant IARA;

(2)    he had not performed any lobbying or advocacy for the defendant

IARA; and

(3)    the payments he had received from the defendant IARA were

charitable donations intended to assist him in writing a book about bridging the gap between

Islam and Christianity.

B.    On or about April 26, 2007, in Kansas City, Missouri, the defendant

MARK DELI SILJANDER did knowingly and willfully make materially false, fictitious and

fraudulent statements and representations to Assistant United States Attorneys and agents of

the Federal Bureau of Investigation, acting on behalf of the grand jury, to wit:

(1)    he had performed no services in exchange for the money he

received from the defendant IARA;

36

(2)     the payments he had received from the defendant IARA were charitable donations intended to assist him in writing a book about bridging the gap between Islam and Christianity; and

(3)     he had not spoken to anyone from the defendant IARA on the telephone about performing services for the organization, or for any reason other than to thank the organization for its "donation."

C.     When the defendant MARK DELI SILJANDER made each of the statements identified in the sub-paragraphs above, he then well knew and believed that each statement was false, in that:

(1)     the defendant MARK DELI SILJANDER had been hired by the defendant IARA to perform services;

(2)     the defendant MARK DELI SILJANDER had performed services for the defendant IARA;

(3)     the payments the defendant MARK DELI SILJANDER had received from the defendant IARA were compensation for the services he had been hired to perform; and

37

performing services for the defendant IARA, and routing payment for those services through

non-profit foundations on the telephone with representatives of the defendant IARA.

All in violation of Title 18, United States Code, Sections 1503(a) and 1512(i).

## COUNT THIRTY-THREE
(Corrupt Endeavor to Obstruct or Impede the Due Administration
of the Internal Revenue Laws)

### General Allegations

74. The allegations of paragraphs 2 through 73 are re-alleged, and paragraphs 79

through 89 are alleged and incorporated by reference as though fully set forth in this Count.

75. The Internal Revenue Service (IRS) was the federal agency whose mission it

was to oversee the operation of organizations exempt from income tax under

Section 501(c)(3) of the Internal Revenue Code. In accomplishing this mission, the IRS

primarily relied upon information reported annually by each tax-exempt organization on IRS

Forms 990, Return of Organization Exempt from Income Tax, detailing the organization's

income, expenses and activities during the calender year. Additionally, in determining an

organization's entitlement to tax-exempt status, the IRS utilized information provided by tax-

exempt organizations in response to specific IRS inquiries, information provided by other

federal and state agencies, and members of the public.

38

**Statutory Allegations**

76.     Beginning on or about January 1, 1997, and continuing until on or about October 13, 2004, in the Western District of Missouri, and elsewhere, the defendants **IARA** and **MUBARAK HAMED** did corruptly endeavor to impair and impede the due administration of the Internal Revenue laws by using the defendant IARA's tax-exempt status to solicit funds, representing that they were legitimate charitable contributions, and to misuse part of those funds by transferring those funds to Iraq, and to Pakistan for the benefit of SDGT Gulbuddin Hekmatyar, purposes prohibited by law, and for other purposes not in furtherance of the defendant IARA's purported charitable mission.  The defendants IARA and MUBARAK HAMED continued their corrupt endeavor by omitting from IARA's IRS Forms 990 their transactions with persons and entities in Iraq and Pakistan, failing to disclose relevant requested information regarding the control, history and affiliations of the defendant IARA, making false public statements, and making false statements to agents and officials of the United States Government.

77.     The defendants IARA and MUBARAK HAMED, in furtherance of their corrupt endeavor to impair and impede the due administration of the Internal Revenue Code, engaged in the following acts:

A.     From in or before June 1998 and continuing until on or about May 23, 2003, the defendants IARA and MUBARAK HAMED solicited donations through various

39

means, including pamphlets, flyers, newsletters and personal correspondence (hereinafter "solicitations"), improperly requesting contributions to pay for projects in Iraq. Most of these solicitations specifically referenced the defendant IARA's tax-exempt status under Section 501(c)(3) of the Internal Revenue Code (Title 26, United States Code) by including the statement, "Make your tax-deductible donation to: IARA - USA," or words to that effect. Additionally, the solicitations sometimes specifically referenced the tax identification number assigned to the defendant IARA by the IRS, which was 43-1439368;

B. From in or before June 1998, and continuing until on or about May 23, 2003, the defendants IARA and MUBARAK HAMED improperly accepted monetary contributions specifically designated for projects in Iraq;

C. From in or before June 1998, and continuing until on or about May 23, 2003, the defendants IARA and MUBARAK HAMED used funds received as charitable contributions to engage in prohibited transactions involving Iraq, as alleged in Counts Two (2) through Twelve (12) and Fourteen (14) through Twenty-Four (24) of this Indictment;

D. From in or about March 2003 and continuing until in or about August 2004, the defendants IARA and MUBARAK HAMED used funds received as charitable contributions to engage in prohibited transactions involving the Shamshatu Refugee Camp in Pakistan, as alleged in Counts Thirty-Four (34) through Forty-One (41) of this Indictment;

40

E. On or about December 15, 2001, the defendants IARA and MUBARAK HAMED improperly diverted $47,000.00, funded from charitable contributions, for use as a contingency fund. The defendants attempted to conceal the diversion of the $47,000.00 through the purchase of eleven (11) cashiers checks in the names of various IARA employees, without the knowledge or permission of those employees. The defendants then improperly disbursed $20,000.00 of this fund to pay attorney fees and post bond for an individual identified by the initials A.M., concerning immigration charges;

F. On or about the dates set forth below, the defendants IARA and MUBARAK HAMED filed IRS Forms 990, Return of Organization Exempt From Income Tax, for the tax years set forth below:

| DATE FORM 990 FILED | TAX YEAR |
|---|---|
| 06/29/98 | 1997 |
| 08/10/99 | 1998 |
| 07/14/00 | 1999 |
| 05/22/01 | 2000 |
| 08/16/02 | 2001 |
| 08/14/03 | 2002 |
| 08/18/04 | 2003 |

G. The defendants IARA and MUBARAK HAMED, on each of the IRS Forms 990 listed above, which required in Part III, Statement of Program Service

41

Accomplishments that they detail all of their exempt purpose expenses, knowingly failed to disclose the fact that they provided funds for projects and persons in Iraq;

H. The defendants IARA and MUBARAK HAMED, on the IRS Form 990 listed above for the year 2003, which required in Part III, Statement of Program Service Accomplishments that they detail all of their exempt purpose expenses, knowingly failed to disclose the fact that they provided funds to the Shamshatu Refugee Camp in Pakistan, which was under the control of Gulbuddin Hekmatyar;

I. The defendants IARA and MUBARAK HAMED, on each of the IRS Forms 990 listed above, in response to Question 76, which asked: "Did the organization engage in any activity not previously reported to the IRS? If 'Yes,' attach a detailed description of each activity," falsely answered "no," and failed to disclose the improper and illegal activities set forth in Counts One (1) through Thirty-Two (32) and Thirty-Four (34) through Forty-One (41) of the Indictment;

J. The defendants IARA and MUBARAK HAMED, on each of the IRS Forms 990 listed above, in response to Question 80a, which asked: "Is the organization related (other than by association with a statewide or nationwide organization) through common membership, governing bodies, trustees, officers, etc., to any other exempt or nonexempt organization?" falsely answered "no," and failed to disclose their relationships to the Islamic Relief Agency (ISRA), also known as the Islamic African Relief Agency,

42

headquartered in Khartoum, Sudan, and to the ISRA branch office located in Amman, Jordan;

K. The defendants IARA and MUBARAK HAMED, on the IRS Form 990 for the year 2003 listed above, in response to Question 80a, which asked: "Is the organization related (other than by association with a statewide or nationwide organization) through common membership, governing bodies, trustees, officers, etc., to any other exempt or nonexempt organization?" falsely answered "no," and failed to disclose their relationships to Gulbuddin Hekmatyar and Hezb-e-Islami (HIG) in Pakistan;

L. The defendants IARA and MUBARAK HAMED, on the IRS Form 990 listed above for the year 1997, in response to Question 76, which asked: "Did the organization engage in any activity not previously reported to the IRS? If 'Yes,' attach a detailed description of each activity," falsely answered "no," and failed to disclose that in the year 1997, IARA paid the expenses of Ziyad Khaleel, an employee of IARA, for travel to Michigan and London, England, for purposes unrelated to IARA's purported charitable mission;

M. On or about November 6, 2001, the defendant IARA, through an individual authorized to act on its behalf, engaged in a television interview via satellite transmission from Columbia, Missouri, to Atlanta, Georgia, wherein the defendant IARA falsely and publicly claimed that Ziyad Khaleel, a then publicly identified associate and

43

procurement agent of Osama Bin Laden, had never been an employee of the defendant

IARA, when in fact, as the defendants IARA and MUBARAK HAMED then and there well

knew and believed, he had been;

N.   On or about October 13, 2004, during an interview with agents of the

IRS, the defendant MUBARAK HAMED falsely stated that he had applied for a job with the

defendant IARA, and did not disclose that, on or about April 18, 1990, he had been

transferred by the Islamic African Relief Agency, located in Khartoum, Sudan, to the

defendant IARA's office in Columbia, Missouri; and

O.   On or about October 13, 2004, during an interview with agents of the

IRS, the defendants IARA and MUBARAK HAMED falsely stated that they had not

transferred funds to Iraq while the sanctions were still in effect, and that funds were only

used for Iraqi refugees located in Jordan.  However, the defendants then and there well knew

and believed the statement was false, in that they had transferred funds to Iraq while the

sanctions were in effect.

All in violation of Title 26, United States Code, Section 7212(a).

### COUNTS THIRTY-FOUR through FORTY-ONE
(Prohibited Transactions with a Specially Designated Global Terrorist)

78.   The allegations of paragraphs 2 through 28 and 36 through 43 of this

Indictment are re-alleged and incorporated by reference as though fully set forth again.

44

79.     On May 2, 2002, an individual associated with Gulbuddin Hekmatyar sent a letter to the defendants IARA and MUBARAK HAMED, seeking assistance and financing to construct an orphanage near Peshawar, Pakistan, for Afghanistan refugees.

80.     On July 9, 2002, the individual referred to in paragraph 79 submitted to the defendants IARA and MUBARAK HAMED a written proposal to re-open and operate an orphanage near Peshawar, Pakistan, for Afghanistan refugees.

81.     In or about September 2002, a third person not associated with IARA, herein identified as W-1, approached individuals employed by the defendant IARA, requesting financing to start an orphanage and/or private school in Pakistan.

82.     On December 16, 2002, the defendants IARA and MUBARAK HAMED told W-1 that they would assist W-1 in opening an orphanage in Pakistan, but that W-1 would have to use the previously submitted written proposal, and further W-1 would have to work with Qutbuddin Hillal in Pakistan.  W-1 learned that Hillal ran the al Imran Welfare Society in Pakistan, and was referred to as the "Jala," or deputy, of Gulbuddin Hekmatyar.  W-1 told the defendants IARA and MUBARAK HAMED that W-1 had further learned that Hillal and Hekmatyar had been previously kicked out of refugee camps for "mujahideen stuff" and that W-1 was uncomfortable working with them.

83.     On or about January 5, 2003, W-1 spoke with the defendant MUBARAK HAMED, informing him that the buildings located within the Shamshatu refugee camp that W-1 was directed to renovate and turn into an orphanage were "Hekmatyar buildings."  W-1 also expressed discomfort with working with Hillal, who W-1 described as too "political."

45

84.     On January 7, 2003, the defendant MUBARAK HAMED told an IARA employee about W-1's misgivings about the people IARA had directed W-1 to work with in Pakistan, stating that "these are not the kind of people [W-1] wants to talk to because they are Hekmatyar people."

85.     On February 19, 2003, pursuant to the President's authority, specifically Executive Order 13224, the Secretary of the Treasury, in consultation with the Secretaries of State and Homeland Security and the Attorney General, designated Gulbuddin Hekmatyar as an SDGT, thereby blocking, as a matter of law, all transactions and dealings with property and interests of Gulbuddin Hekmatyar.

86.     On or about April 15, 2003, an opening ceremony was held in the Shamshatu refugee camp for the orphanage being funded by the defendants IARA and MUBARAK HAMED.

87.     On or about July 15, 2003, a contract for the operation of the Shamshatu orphanage was signed by the defendants IARA and MUBARAK HAMED, as well as Qutbuddin Hillal and other relevant parties.

88.     Between 2002 and 2004, the defendant IARA sent and caused to be sent, approximately $260,000.00 to accounts in the name of, or under the control of, the Islamic Relief Agency (ISRA) in Peshawar, Pakistan.

89.     On or about and between February 19, 2003, and August 6, 2004, in the Western District of Missouri, and elsewhere, the defendants **IARA** and **MUBARAK HAMED**, aided and abetted by each other, and others known and unknown to the Grand Jury, did knowingly and willfully engage and did attempt to engage in financial transactions

46

and otherwise deal and attempt to deal in property and interests in property of and for the benefit of Gulbuddin Hekmatyar, an SDGT, that is, on the dates, and in the amounts, set forth below, the defendants sent, and caused to be sent, approximately $130,000.00 to ISRA bank accounts in Peshawar, Pakistan, for the stated purpose of renovating buildings located in the Shamshatu Refugee Camp, which were owned and controlled by SDGT Gulbuddin Hekmatyar, for the stated purpose of re-establishing and operating an "orphanage":

| COUNT | DATE OF WIRE TRANSFER | APPROXIMATE AMOUNT |
|---|---|---|
| 34 | 03/24/03 | $ 9,772.00 |
| 35 | 04/30/03 | $ 10,883.00 |
| 36 | 05/28/03 | $ 22,489.00 |
| 37 | 08/27/03 | $ 20,360.00 |
| 38 | 11/24/03 | $ 5,428.54 |
| 39 | 12/31/03 | $ 7,167.00 |
| 40 | 01/27/04 | $ 25,501.00 |
| 41 | 08/06/04 | $ 28,501.00 |

All in violation of Title 50, United States Code, Sections 1701 through 1706; Title 31, Code of Federal Regulations, Section 594.204; and Title 18, United States Code, Section 2.

## FORFEITURE ALLEGATION
(18 U.S.C. §§ 982(a)(1) and (b)(1))

90.    A defendant who is convicted of one or more of the money laundering or monetary transaction offenses in violation of Title 18, United States Code, Section 1956, alleged in Counts Thirteen (13) through Twenty-Four (24) and Twenty-Eight (28) through

47

Thirty-One (31) of this Indictment, shall forfeit to the United States of America, all property, real and personal, involved in the money laundering and monetary transaction offenses, and all property traceable to such property, as well as all property used in any manner or part to commit or to facilitate the commission of those violations, including but not limited to, the following:

A. Defendants **IARA**, **MUBARAK HAMED**, **ALI MOHAMED BAGEGNI**, **KHALID AL-SUDANEE** and **AHMAD MUSTAFA** shall forfeit approximately $1,375,712.00 in United States currency. That sum represents the sum of monies involved in the international financial transactions used to promote the carrying on of specified unlawful activity as set forth in Counts Thirteen (13) through Twenty-Four (24), for which the defendants are jointly and severally liable; and

B. Defendants **IARA**, **MUBARAK HAMED**, **ALI MOHAMED BAGEGNI**, **ABDEL AZIM EL-SIDDIG** and **MARK DELI SILJANDER** shall forfeit approximately $46,350.00 in United States currency. That sum represents the sum of monies involved in the financial transactions used to conceal the nature, source and ownership of the proceeds of specified unlawful activity as set forth in Counts Twenty-Eight (28) through Thirty-One (31), for which the defendants are jointly and severally liable.

91. By virtue of the commission of one or more of the felony offenses charged in Counts Thirteen (13) through Twenty-Four (24) and Twenty-Eight (28) through Thirty-One

48

(31) of this Indictment by the defendants **IARA**, **MUBARAK HAMED**, **ALI MOHAMED BAGEGNI**, **AHMAD MUSTAFA**, **KHALID AL-SUDANEE**, **ABDEL AZIM EL-SIDDIG** and **MARK DELI SILJANDER**, any and all interests which the defendants have in the above-described sums are vested in the United States and are hereby forfeited to the United States pursuant to Title 18, United States Code, Section 982(a)(1).

92.    In the event that any property, real or personal, involved in the offenses and described in Counts Thirteen (13) through Twenty-Four (24) and Twenty-Eight (28) through Thirty-One (31) of this Indictment, or any property traceable to such property, as a result of any act or omission of the defendants:

        A.    cannot be located upon exercise of due diligence;

        B.    has been transferred or sold to, or deposited with a third party;

        C.    has been placed beyond the jurisdiction of the court;

        D.    has been substantially diminished in value; or

        E.    has been co-mingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of said defendants up to the value of the above property.

A TRUE BILL.

49

| 10/21/08 | /s/John R. Lowry |
| DATE | FOREPERSON OF THE SPECIAL GRAND JURY |

/s/Anthony P. Gonzalez

**Anthony P. Gonzalez**
Assistant United States Attorney
Western District of Missouri

/s/Steven M. Mohlhenrich

**Steven M. Mohlhenrich**
Assistant United States Attorney
Western District of Missouri

/s/Anthony P. Gonzalez for

**Corey J. Smith**
Senior Litigation Counsel
Tax Division, U.S. Department of Justice