IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 07-00087-CR-W-NKL |
| | ) | August 15, 2007 |
| V. | ) | Kansas City, Missouri |
| | ) | CRIMINAL |
| ISLAMIC AMERICAN RELIEF | ) | |
| AGENCY, et al., | ) | |
| | ) | |
| Defendants. | ) | |


TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE NANETTE K. LAUGHREY
UNITED STATES DISTRICT JUDGE

Proceedings recorded by electronic stenography
Transcript produced by computer

Kathleen M. Wirt, RDR, CRR
United States Court Reporter
400 E. 9th Street, Suite 7452 * Kansas City, MO 64106
816.512.5608

**APPEARANCES**

For Plaintiff:          MR. ANTHONY PETER GONZALEZ
Assistant U.S. Attorney
P.O. Box 117
Jefferson City, MO 65102

For Defendant         MR. CURTIS WOODS (By phone)
Mubarak Hamed:       MR. BARRETT J. VAHLE
MS. JULIE COX
Sonnenschein, Nath & Rosenthal
4520 Main Street, Suite 1100
Kansas City, MO 64111

For Defendant         MR. JOHN C. AISENBREY
Ali Mohamed Bagegni:   Stinson Morrison Hecker
1201 Walnut Street, Su tie 2900
Kansas City, MO 64106-6251

For Defendant Ahmad    MR. TROY STABENOW
Mustafa:             Federal Public Defender's Office
221 Bolivar Street, Suite 104
Jefferson City, MO 65101

For Defendant Abdel    MR. JEAN PAUL BRADSHAW (By phone)
Azim El-Siddiq:      Lathrop & Gage
2345 Grand Avenue, Suite 2800
Kansas City, MO 64108-2684

AUGUST 15, 2007

- - -

THE COURT: All right. This is the matter of the United States of America versus Islamic American Relief Agency, Case No. 07-87.

And I have a couple of people on the telephone. I'd like to start with them. Who do I have on the phone?

MR. WOODS: Your Honor, Curtis Woods on behalf of Mubarak Hamed.

MR. BRADSHAW: Your Honor, this is Jean Paul Bradshaw appearing for Abdel Azim El-Siddiq.

THE COURT: All right. I can hear you fine. Can you hear me okay?

MR. BRADSHAW: I can hear you very well.

THE COURT: All right. Who, then, is here on behalf of the government?

MR. GONZALEZ: Anthony Gonzalez on behalf of the government. Good morning, Your Honor.

THE COURT: Mr. Garrett is not here today?

MR. GONZALEZ: No, Judge, Mr. Garrett is in Texas and other counsel are in D.C. or Boston.

THE COURT: Who do I have here, then, for the other defendants, beginning with Mr. Stabenow?

MR. STABENOW: Mr. Troy Stabenow from the Federal Defender's Office on behalf of Ahmad Mustafa.

MR. AISENBREY: John Aisenbrey from Stinson Morrison Hecker on behalf of Ali Bagegni.

MR. VAHLE: Barrett Vahle, Sonnenschein, Nath & Rosenthal, for Mubarak Hamed.

MS. COX: My name is Julie Cox, Sonnenschein, Nath & Rosenthal.

THE COURT: Okay. Those of you who are at counsel table, if you want codefendants' counsel to hear, you have to speak into the microphone. They won't be able to hear unless you're talking into the microphone. All right.

We, of course, have Miguel here, our court security officer. I have my two new law clerks here, Justin Davids and Sam Halabi, and I think that's everybody.

I wanted to have this meeting to discuss the protective order, and there are some broad issues that I think are best dealt with first. The first one is the issue of whether or not the defendants can ever have access to any classified information. And I'd like to -- it seems to me, if I understand this case correctly, it is largely, or a big piece of it is based on intercepted telephone conversations involving the defendants. Is that correct, Mr. Gonzalez?

MR. GONZALEZ: Defendants and others, yes, Judge.

THE COURT: So when the defendants are on the telephone and those telephone calls have been recorded, are any of those telephone calls classified information and are they

identified as such?

MR. GONZALEZ: Yes, Judge, at this point all calls are classified. Yes.

THE COURT: So are you contending that the defendants cannot listen to their own telephone calls? That they participated in.

MR. GONZALEZ: At this point and as an initial matter, yes, we are, Judge.

THE COURT: Why?

MR. GONZALEZ: Because the only persons who have access to classified information are people who are cleared. We don't believe that the defendants have a right at this point to listen to the calls just generally. They don't. They're not cleared, and CIPA in fact --

THE COURT: When you say generally, you're referring just to their own telephone calls.

MR. GONZALEZ: I'm actually referring to all phone calls.

THE COURT: Sure. I understand that. I'm not going to let them listen routinely to other people's telephone calls, but you're saying that it's the government's position that they can't listen to their own telephone calls?

MR. GONZALEZ: That's correct, Judge.

THE COURT: Okay. Do you have any authority for that?

MR. GONZALEZ: We believe, the government believes, first of all, that that has been done in other cases. I think, in fact, it was done in a case Mr. Garrett is actually trying right now down in Texas. I don't have the cite, and I apologize. I didn't actually pick up the more -- I didn't actually pick up the more particular response which was filed by defendants yesterday until this morning, so I haven't been able to actually do any actually specific research.

I thought, though, that while an interesting problem -- I mean, and I understand that we do think that CIPA provides procedures by which calls may be declassified. We are aware that there are cases, such as, I believe it was Al-Arian case in south Florida which was, I think, they wholesale declassified everything.

That is not the usual practice that the government does and it's the only time that I'm aware that the government has done a wholesale declassification of all materials. But CIPA does provide an avenue by which calls or items may be declassified and that those can then be reviewed by defense counsel.

THE COURT: What is that process?

MR. GONZALEZ: I believe that's a CIPA notice requirement where counsel can review items and suggest, not with great particularity, but that these are items which they want to potentially use to, which are classified and they want

to use in trial, in a hearing. We would suggest also in review with their clients. They could then ask the government -- we could go through whichever agency is saying that that's classified, and they may just say that's fine, you can do that. But rather than wholesale declassifying, we do it on an individualized basis so we don't declassify a lump so we would have no control over a phone call with maybe a potential target or a potential terrorist.

THE COURT: Do you have any authority that the court does not have the authority to, rather than go through all of those steps, reach the ultimate question, which is whether or not somebody's own telephone call that they themselves have made should be able to be listened to by the person who made the call?

In other words, we could for every one of these calls send you a notice, the defendants, send a notice to you, saying that we want you to declassify the calls so that we can look at them. And then you go to the agency, and the agency says yes or no, and then you come to the court.

MR. GONZALEZ: May I just jump back? The question was do I have any direct authority that says a defendant is able to listen to his own phone calls, period. I have no authority one way or the other. My suggestion, though, is that I don't think that somebody -- at this point I'm going to suggest that I think it's premature to get to that particular

question. If, in fact, each defense counsel who wanted to say we want to hear each of our own phone calls made that notice and then we could actually process that and if the agencies say no problem, then there is no issue. We can do that. I just think that to wholesale do it out front makes no sense or at least --

THE COURT: Well, tell me why it makes no sense because it seems to me it would make no sense to have 88,000 requests or however many they're, how they're grouped, sent to these agencies when, in fact, I'm going to let them listen to their own telephone calls.

MR. GONZALEZ: I wasn't suggesting that there be 88,000. I'm suggesting there would be one for each defendant, Mr. Hamed saying I want to listen to all of my phone calls.

THE COURT: Right. I understand that. But you're saying that they have to go through these phone calls in order to decide whether or not to grant that request, and there's 88,000 of them, according to my, what you've told me.

MR. GONZALEZ: Well, there are 88,000 phone calls, not each individual appears on each one of them, yes, Judge, there are. And, again, I misunderstood. Are you asking -- I thought the question was do they have the right to listen to their own phone calls.

THE COURT: Their own.

MR. GONZALEZ: Their own would be less than 88,000.

Their own phone calls would be perhaps a thousand for one, maybe as few as a couple hundred for another. That would either require one request for all thousand, in which case the agency could start looking at it right away. When I'm saying agency, I'm not talking about a particular agency.

THE COURT: Tell me what it is the agency is going to say why it is they can't listen to their own telephone calls.

MR. GONZALEZ: There may be a particular call -- and I'm only guessing. There may be a particular call to Terrorist A who we do not want to disclose at this point or we don't want the individual to know that there's --

THE COURT: The defendant knows about them. It's not going to say Terrorist A, is it?

MR. GONZALEZ: Perhaps, but he may not know that that call was recorded and he may not know that we have that available to him and he may not -- he may, once hearing it because we can't control what he does after it, he may end up making a phone call to that individual or writing them a letter or passing them information and saying, go ahead, they have your phone call, you may want to do, A, which may be flee or something like that. And that's a security concern which I think is the reason that the notice requirement is there.

THE COURT: Let me take a step back, then. I thought we were going to be able to deal with this easily today

because it seems obvious what's going to happen here, but it seems the government is not going to be agreeable.

I have looked at protective orders of other cases like this that are handling classified information, and there are specific exemptions dealing with defendants looking at their own information.

Okay. You don't want to do that. I understand that. I assume that everybody here has good will. We all want to protect the interests of the United States of America, and that nobody wants to, in fact, undermine the security of this country.

I would think that if, in fact, these defendants are threats to the security of the United States, then the best thing would be to get them convicted and get them in a place where they can't continue to be a threat to the United States. These kinds of procedural hurdles that you are throwing up, in fact, delays that process and it substantially increases the costs of this litigation.

But if you think that is the way that, in fact, all of these telephone calls need to be handled, unless the defendants can give me some authority that says they have the right to hear their own phone calls, even when they're classified information, and that the Classified Information Procedures Act does not apply, then I will give the government their way.

Mr. Stabenow.  Just a minute, let me have --
Mr. Stabenow wishes to respond to your argument.

MR. STABENOW:  Your Honor, first of all --
Mr. Stabenow on behalf of Mr. Ahmad Mustafa.

First of all, I think we understand Mr. Gonzalez's position.  The U.S. Attorney manual, criminal resource manual on this subject has a Section 2054 dealing with a synopsis for U.S. Attorneys for the Classified Information Procedures Act, and it directs them that at the first hearing, the prosecutor during the proceeding should strive to have the court exclude as much classified information as possible from the government's discovery obligations.  So he's under this policy guidance to take this position with the court.

And we understand from the CIPA proposal put forward to the court by the government in this case that it's their position that none of the defendants, this is on page 2, none of the defendants have security clearances and, therefore, classified information cannot be shared with them.

In fact, this is contrary to the policy guidance by the executive to them through their own criminal resource manual.  In their criminal resource manual, it directs them that the requirements of security clearances does not extend to the judge or to the defendant.  And it directs that CIPA is a procedural statute that neither adds to nor detracts from the substantive rights of the defendant or the discovery

obligations of the government.

Looking, then, at Rule 16, Rule 16 of the Federal Rules Of Criminal Procedure dictates that upon a defendant's request, the government must disclose to the defendant any relevant written or recorded statement by the defendant if the statement is within the government's possession, custody, or control and the attorney for the government knows or through diligence could know that such a statement exists.

When we look at the actual CIPA, the government keeps asking us to look at Sections 5 and 6. Section 5 is the notice of defendant's intention to disclose classified information. And that deals with intended use at trial or in an open hearing in front of the public.

What we ought to be focusing on at this point is Section 4, which is discovery of classified information by defendants. There is a provision by which the court can prevent a defendant from having access to specific classified materials. But the requirement under Section 4 is that the court upon a sufficient showing may authorize the United States to delete specified items of classified information --

THE COURT: Slow down. I have a court reporter.

MR. STABENOW: Sure. Section 4, the discovery of classified information by defendants, begins, the court, upon a sufficient showing, may authorize the United States to delete specified items of classified information from documents to be

13

made available to the defendant.

All right. The government, therefore --

THE COURT: Say that again for me now.

MR. STABENOW: Yes, Your Honor. The court, upon a sufficient showing, may authorize the United States to delete specified items of classified information from documents to be made available to the defendant.

So the procedure, the procedural posture, you know, CIPA, right from the get-go is saying it doesn't change your substantive rights. Federal Rule of Criminal Procedure 16 says you have a substantive right to the statements you've made, to the recordings of them, and CIPA, the procedural component of CIPA, Section 4 says if the government wants to omit something that you have a right to see, they have to make a sufficient showing to the court to then follow a procedure to have that stuff that the defendant is entitled to omitted from discovery to them.

So if, for example in 88,000 intercepts, the government has three intercepts from 1997 where Defendant X talks to supposed Terrorist A, then the government could come in front of the court and say we have these three tapes we don't believe should be disclosed.

Now, it's our position right now, all of the defendants, our clients all believe that every phone call they made from 1994 on was taped, intercepted, and listened to by

the United States government. That's basically what the government has represented in the past, that's what our clients believe to be the case, and they've been out for months on end.

When we look at the other cases, there was a reference made by the government to the Al-Arian case. The Al-Arian case is a good example of how to handle the tension between the substantive rights to which the defendant is entitled and the procedural hurdles that the government by policy, the government attorneys are told to pursue to try and limit their discovery.

What happened in the Al-Arian case, which was in the Middle District of Florida and which I'm sure the court is aware of, is that Judge Moody, Jr., said you know what, government, you're entitled to a CIPA order, here it is. The defendants are also entitled to their Rule 16 rights. You must make the tapes available to them. I'll give you a week to resolve the conflict or the trial goes into abeyance until the government decides.

Because the CIPA, one of the provisions in the CIPA is that the CIPA says that it was put in place to give the government notice so they could evaluate the cost of going forward in a prosecution.

So Judge Moody said, here is the costs, the cost is you've got to resolve the conflict. The defendants have a right to listen to their own statements.

15

Amazingly, within a couple of business days, 21,000 hours were declassified. The defense is highly skeptical that analysts actually went back and reviewed the whole 21,000 hours. It's just that somebody finally made a request and it happened.

Now, if the government seeks to make this showing under Section 4, then we're going to want to argue -- I mean, the whole world knows from, the whole world knows that Iraqi nationals are listened to by our government. And the nature and means of those intercepts, which is what has been represented in the past hearings is the basis for the classification, was released in the Al-Arian case because it was the exact same pattern. It was an individual, a group of individuals who were supposedly raising money to send it overseas to an organization associated with terrorism, and their calls were intercepted from the mid-nineties through the prosecution of their case in, I believe, 2003.

Now, one of the hurdles that we have to look at in balancing these rights, and we -- I mean, it's our position that it's clear that the defendants get to listen to their own statements. But one of the other things that the, that must be taken into account under Section 4 under a sufficient showing is there is no way for the defense to adequately satisfy their rights without that release.

In the Al-Arian case, even when the tapes were

released -- and there was 21,000 hours of tapes -- it took two and a half years for three full-time native speaking translators to translate those tapes at a cost of $1.3 million. If our clients cannot listen to their own -- and ultimately, the translation of those tapes proved to be critical in the case because of the subtleties of the Arabic language. In fact, to make an English equivalent, in one particular part of the population, if I say brother, it means purely my fraternal, the fraternal offspring of my parents. If you're in another part of the population, it could mean a friend or just somebody who lives on the street with you. Those same sort of nuances proved to be critical at that trial and ultimately resulted in the acquittals.

If the government without complying with the Section 4 requirement denies our clients the ability to listen to their own phone calls, then we have no means to make sure there's a proper translation and understanding of what our clients are saying. Because we're not allowed to talk to them about it, we're not allowed to talk to anybody else, and the government has indicated that only an American citizen can serve as a translator and an American citizen will lack that native fluency to properly understand those nuances which come into play when it's kind of association guilt.

We don't believe that the government has made any effort to comply with Section 4, and it's clear that the CIPA,

which is just a procedural process, that we're at Section 4. It's clear the Federal Rule of Criminal Procedure 16 applies, which is the rule that protects the defendant's constitutional rights. That's the basis on which we believe our clients, and even by their own policy manual, our clients are entitled to listen to their own conversations.

Now, it's absolutely correct that --

THE COURT: Hold on one minute.

(A discussion was had off the record between the court and court staff.)

THE COURT: Okay. Go ahead.

MR. STABENOW: It's absolutely correct that the government, there is classified material in this case. The government can request and you do have to comply with that request upon their showing that it's classified, which I believe they can, that you must grant a CIPA order. And that's why we have not opposed the CIPA order, per se, because there is classified material, the CIPA order does come in.

But it is also appropriate for the court to say the CIPA order is in conflict with the constitution rights of these defendants, which are recognized even within the CIPA, government, if you want them to or not; if you want to move forward with this case, resolve the conflict.

And so that's our position today is that it's upon the government, it's their decision.

THE COURT: I want to make sure I understand, though, how this all plays in with the Speedy Trial Act. Are you saying that, in fact, each of the defendants wants to waive their right to a speedy trial while this matter gets resolved by the government? Because otherwise, I enter the protective order and we deal with it on a case-by-case basis as it comes up.

MR. STABENOW: I'm not sure I'm following you, Your Honor.

THE COURT: If I understand you correctly, you're saying let's just stop here until we get this issue resolved. Either the government declassifies for purposes of each individual defendant their telephone calls so that they can have their statements as required by Rule 16, or not and --

MR. STABENOW: No, Your Honor, it's my position -- and the other defendants may have a different take on this. It's my position that that's not the defendant who has to waive the speedy trial right on that. It is, as recognized by the CIPA, the ability for the government to analyze the costs of moving forward in prosecution and decide what they want to do, just as if the government had to subpoena witnesses from overseas, they could say, gosh, do we want to move forward to trial or get a continuance, how do we want to handle it? The burden is on them.

THE COURT: As a practical matter, what are you

asking the court to order?

MR. STABENOW: That the government comply with their constitutional responsibility.

THE COURT: To give the defendants' statements to the defendants.

MR. STABENOW: Correct.

THE COURT: Okay. And the defendant -- the government says that that would violate CIPA.

MR. STABENOW: And I believe I've demonstrated that it does not. And if the government wishes to try and make a showing under Section 4 of CIPA that there is some, a particular tape or tapes of these defendants that is in national security and that needs to be protected from them listening to so that they only get, say, a summary as provided by --

THE COURT: It's a burden of proof issue. He's claiming that you all have the burden of proof to come forward and get these tapes unclassified, and you're saying that under Section 4, he's got the burden of proof to come forward and show that a particular tape is, in fact, a problem.

MR. STABENOW: As it applies to each of our defendants. So, for example, under CIPA they can restrict me giving Bagegni's tapes to my client; but in regards to each of our own individual clients, yes, that's what I'm arguing, Your Honor.

THE COURT: Okay. Do any of the other defense counsel wish to address this issue?

MR. AISENBREY: This is John Aisenbrey, Your Honor. No, Mr. Stabenow and I discussed this in advance, and he presented the argument at least on behalf of my client.

MR. WOODS: On behalf of Defendant Hamed, we join with Mr. Stabenow.

THE COURT: If those of you on the phone could identify yourselves for my court reporter.

MR. WOODS: I'm sorry, Your Honor. Curtis Woods. We join Mr. Stabenow's argument on behalf of Defendant Hamed.

MR. BRADSHAW: This is Jean Paul Bradshaw, Your Honor. We join on behalf of Defendant El-Siddiq, as well. And I guess I would add one small comment to the question you raised about the Speedy Trial Act.

And that is, I think, you know, that gets to the heart of many of the problems in this case is that there is some inherent conflicts here of, you know, the defendants being placed in positions where they're having to make choices between various rights that they have. And I think, you know, while they have the right to a speedy trial, at the same time, you know, we believe that they have certain other rights. And, you know, being forced to choose one over the other makes it difficult for us to go and adequately represent our client and for them to get the kind of trial that we believe they're

entitled to have.

THE COURT: All right. And to make sure I understand, you're actually asking for an order of the court in the protective order to put in some kind of provision that says the defendants have the right to their statements unless the government within a certain period of time demonstrates that that would violate national security concerns.

MR. STABENOW: Yes, Your Honor. Under Section 4, yes, Your Honor.

THE COURT: Okay. I think I at least have the various arguments of the parties. Would you like to reply?

MR. GONZALEZ: No, Judge. And as a matter of fact, we would not disagree that's a good posture to put this in. I don't think the government means to be here actually opposing this, but I think we need something that says --

Until this particular time I don't think it was official that each defendant wanted to get their own statements to review. I understand that that's what most defendants do, but we always took the position that they were not going to get that, and that's what we're going to put in our motion for protective order.

I have talked -- and I'm not suggesting that counsel has to call me up and tell me everything, but if someone had said can you give us these statements, I could have actually started at least whatever paperwork that we have because I do

believe ultimately, ultimately they will get those. I mean I believe --

THE COURT: Ultimately is the key word here because we have a date for trial and there's a lot of telephone calls. So ultimately could be six months from now, and that wouldn't be very useful.

MR. GONZALEZ: I wasn't suggesting -- I'm sorry. I didn't mean to interrupt the court.

I wasn't suggesting ultimately six months down the road. I'm suggesting that I could actually call up and say, look, we need a response to this within 30 days, all calls for each individual, as to each one of the calls.

THE COURT: I think we've got it resolved, then. What I'm hearing the parties say is that the protective order will be modified to provide that the defendants will not have access to any classified materials, except for their own statements and by -- intercepted or otherwise -- and unless as to that latter category, the government within 30 days demonstrates to the court that, in fact, there is a national security concern with permitting the defendants to review those documents. Is that your understanding, Mr. Gonzalez?

MR. GONZALEZ: I'm not exactly sure what the court said.

THE COURT: Well, two parts. One was, the overarching issue is defendants can't see classified

information. I think everybody is in agreement with that. Yeah, everybody is in agreement. They may not like it, but everybody is in agreement that that's not what we're talking about here.

What we're talking about is the telephone calls that were made and any other statements that were given or intercepted by the government by these, concerning telephone calls that these individual defendants made.

MR. GONZALEZ: So that each individual defendant, Mr. Hamed, for instance, wants access to their own phone calls, Mr. El-Siddiq to his own.

THE COURT: Each defendant wants access to their own phone calls, and they have a right to have access to their own phone calls unless you, the government, within 30 days demonstrates to the court that, in fact, there is a national security concern that would occur if, in fact, the defendants have access to their telephone calls.

MR. GONZALEZ: Just as a matter of mechanics, in order for us to proceed, shall we -- or will the court, then, enter an order with that in there so we can actually start delivering the phone calls now and then the classified calls will not be shared with the respective defendants until after that 30 days?

THE COURT: Let me take a step back. What we're going to do here today is we're going to hammer out what the

protective order is going to provide. You all are going to get the wording put together, and then you're going to submit it to me for signature, and that's going to occur hopefully within a week. Can we get that done within a week, unless we have some wording problems, which you can contact me immediately by phone to get resolved?

MR. STABENOW: Your Honor, I do have one concern, and I haven't had a chance to talk to other counsel about this in detail. My one concern about this -- and I have articulated what I believe is clear from the CIPA and from discovery rules.

My only concern is that a conspiracy is alleged by the government, such that, although my client -- and normally if it was distinct charges, this would not apply. But under the provisions of a conspiracy where they can use the comments of Bagegni against Mr. Mustafa, then I believe there is an argument that all of those conversations are really Mr. Ahmad Mustafa's because they can be used against him, they are treated as his statements under the law of conspiracy.

And so within that context, I frankly anticipate that all of the defense attorneys are going to be coming back in a day or two and saying we get the other guys' conversations too if they persist in the conspiracy.

THE COURT: First of all, they shouldn't come back in a day or two and ask for that.

MR. STABENOW: I'm saying it now, Your Honor.

THE COURT: Secondly, it seems to me that that's going to have to be handled on a case-by-case basis, that you're going to have to come to me and demonstrate there's something specific that you feel is being used against your client that your client needs to look at. This is not Rule 16. They are not statements of the defendant.

MR. STABENOW: One concern that I know my client has in regards to this whole, the whole handling of this -- and it's our hope that eventually the government will say it's easier to declassify this stuff -- is that our concern gets back to the translators.

I as the attorney am going to have to rely on an American translator to understand what an Iraqi is saying in an Iraqi dialect to another Iraqi. And I have done some research, I've consulted with people in some of these other cases. The government has people like Mr. Garrett who are involved in numerous of these cases. Within the defense community, we just consult.

But it's clear from some of the other cases that I'm consulting with that there are these little subtle words, like there's the words --

THE COURT: I have no doubt about that. When that problem comes up, you come to me and talk about it because I'm not going to let you all look at each other's telephone calls until there's some showing of some kind, specific.

MR. STABENOW: I respect what the court is saying, but what I've been taught by everybody else is that you would, an American like me would not recognize the issue, would not know that something has been mistranslated to a harmful effect, or that something that appeared innocuous is, in fact, was better than innocuous, was exculpatory, and that an American would not appreciate that without a native speaker. That's our concern.

THE COURT: As we know, you can get a translator who is a native speaker.

MR. AISENBREY: Your Honor, this is John Aisenbrey. I want to make sure that I understand what we're doing here so we don't start to draw the language up and there be misunderstanding.

Before this hearing, it was my understanding that each of the defense counsel would have access to all the intercepted calls so that I could listen to the calls that Mr. Stabenow's client had made. What we're doing today is we're saying now my client can hear his own calls; and presumably if they're with Mr. Stabenow's client, they, too, could hear it. But if it's with a third party, only my client can hear it and only his client can hear his calls, but he and I can hear all of the calls.

THE COURT: Correct.

MR. AISENBREY: As long as the government

understands that.

THE COURT: That's my understanding. Defense counsel can hear everything. The defense counsel can, within the limitations of our budget, can hire translators. And, of course, that becomes more of an issue down the road. I'm sure -- and we haven't gotten to this, I want to try to stay focused here, but I remember that we were going to get maybe translations from the FBI. Has that matter been resolved yet? Do we have those transcripts?

MR. GONZALEZ: We have a percentage of the transcripts, Judge. I'm not aware -- I'm not aware of what percentage, but I know that there are translators that were working on them. I say were only because I didn't make a phone call today, I don't know that they still are, on all of the phone calls. Like all things, though, and we tried to do this in our motions -- different translators translate differently, so that's why we always encourage everybody to hire their own to make sure our work is accurate as far as their clients are concerned or whatever.

THE COURT: But my understanding was that there were already translations existing of these phone calls.

MR. GONZALEZ: Not of all of the phone calls, but a --

THE COURT: But a substantial number.

MR. GONZALEZ: Maybe a couple thousand of the

foreign language calls. I don't remember how many there were. It may be that that couple thousand is 10 percent, it may be that it's 14 percent, it may be that it's 50 percent. I just don't recall the number of calls. I don't want to misrepresent anything to the court. There are a lot that are done. I just don't want to say that it's significant.

THE COURT: I guess maybe we should resolve the question of whether there's any legal authority for the court to permit a defendant to listen to classified information that is not the defendant's own statements. You've made your argument, and I have accepted it based upon this Rule 16 conflict with CIPA, but that would not be applicable if we are talking about the telephone calls of other defendants.

MR. STABENOW: Your Honor, I will do appropriate research on this issue. It's my belief that under conspiracy law, the statements of others are attributable to my client and, therefore, become legally his statements.

THE COURT: For now you should draft the order, the protective order to not include that.

MR. STABENOW: Yes, Your Honor, understood.

THE COURT: All right. Now, do we think we've resolved the first question, which is access by the defendants to classified information?

MR. STABENOW: I believe so, Your Honor.

THE COURT: Mr. Gonzalez, do you have anything else

that you think --

MR. GONZALEZ: It appears to me that we've resolved that, as well.

THE COURT: You know, by the way, I thought maybe the reason -- this order is internally inconsistent as you acknowledged. The CIPA part and the FISA part don't match, and it seems to me the reason they don't match is everybody recognizes that the defendants have to have access to their own statements. FISA is, in fact, these intercepted phone calls, right? And I figured that was the reason that those two things didn't fit together properly, but we've perhaps resolved that. All right.

Access to the secured area after hours. I know that defense counsel has indicated that they want access to the secure area after hours. Does anybody wish to speak to that question?

MR. GONZALEZ: We have no objection to total access. I mean, I know it's up to the court.

THE COURT: Okay. Does anybody else want to address the issue, because I'm sure you're aware the court has concerns about this issue.

MR. STABENOW: Your Honor, our office is the office that had requested this after hours access. I am located in Jefferson City; Mr. Loge, my investigator, who is also cleared to review this material with me, is located in Springfield.

The government has ways to access this material.

It's my understanding that the government is looking at putting a safe at the FBI office in Jefferson City where Mr. Gonzalez can go over and review materials right there. That makes it handy for him to do that and we understand why they're doing that. But for us, there's a lengthy drive up here to Kansas City. There's a huge amount of material to review, and if we are being compelled to come to Kansas City because we don't have a safe in Jefferson City, then time-wise, the only way to make this trial work within the time frame that protects our client's rights is if we can come here, stay overnight, and work. Just go in and work all day, take a break for supper, come back, work late into the night, get up the next morning, and go right back into the vault. When we have that many thousands of intercepts to go through, that's the only way that we can foresee doing this in any sort of reasonable time frame.

And it's my understanding from talking to the court administrator that it should be possible to code our access cards -- because Mr. Loge and I only got access cards as a result of this case -- to code our access cards to only work on the front door and the door right at the safe and not to work on any other access card-swiping areas in the courthouse. And that would --

THE COURT: And your access cards are tied to you

personally? In other words, they will know who has entered the courthouse?

MR. STABENOW: Yes, that's my understanding.

MR. AISENBREY: Your Honor, on behalf of, at least for my client, although I'm not traveling from Jefferson City, we typically work evenings and weekends, and the government gets to do that. And, frankly, there's a lot of stuff in there, and we have to know everything in that room. We can't even talk about it in our offices. We have to go over there to talk about it. Well, maybe -- at least as the protective order is currently drafted, that's how they want us to do it.

And I think that if the court security people can allow, as Mr. Stabenow says, access into the building and into that room, we ought to be able to do that. And as I understand it, in other cases that's -- for example, in the recent trial of Mr. Libby, they had 24-hour access to the courthouse for that reason.

THE COURT: Part of the problem, though, is at the D.C. courthouse there's 24-hour security also.

MR. STABENOW: Your Honor, the way they handled it in the Al-Arian case is they actually went out and rented a place that the security staff said they could make secure, and they actually had an office rented and paid for outside of the courthouse that was 24/7 access by the defense. And if we have to go that avenue --

THE COURT: So I guess that's the alternative, either we move the secure access outside the courthouse, but that has to be -- Miguel, help me on this. That would have to be in like a Department of Defense facility?

COURT SECURITY OFFICER: Yes, Your Honor, it will have to be a building that has a 24-hour security on it. If the defense thinks it's okay, it would have to be like an FBI building or U.S. Attorney's building, you would have to be in a court for that or a Department of Defense building.

THE COURT: So it has to be some kind of secure governmental facility.

COURT SECURITY OFFICER: Yes.

THE COURT: Does it have to be a federal facility?

COURT SECURITY OFFICER: Usually it's a federal facility. Like I can talk about the Guantanamo Bay cases where it's a DOD building. They have like a whole floor. It's a DOD building that has 24-hour security.

THE COURT: Everything is still secure so nobody can get into those materials.

COURT SECURITY OFFICER: Exactly.

THE COURT: It would be the same here, that people couldn't go into that office.

COURT SECURITY OFFICER: Exactly.

MR. STABENOW: Your Honor, if we are exploring those alternatives, so, for example, there's a DOD National Guard

headquarters that's 24-hour surveillance in Jefferson City, and that might be an appropriate place to see about having a vault for the defense.

COURT SECURITY OFFICER: Could be.

MR. STABENOW: Our concern is not just to review the discovery now, but as we approach trial.

THE COURT: As I've thought about this, it seems to me that we might do this in phases, that, you know, there really is no reason to have 24-hour access now because you don't even have the classified information yet.

MR. STABENOW: I was under the understanding, Your Honor, that once you sign the order that we will have the access.

THE COURT: Well, you don't have it yet. And obviously, you know, I don't know how much you're going to get immediately anyway.

Let's take a brief recess. I'd like to speak with the marshal's office.

(A recess was taken from 11:53 a.m. to 12:02 p.m.)

THE COURT: All right. Our marshal has been very gracious and will permit after-hour access. You will need to go through a briefing with the marshal's office. It is certainly the court's preference that you limit after-hour access. It is a no-fault liability on your part. In other words, if this building gets broken into because somebody left

the door open, it's no-fault liability. So that's why I really would prefer you use it as little as possible, because I do understand that the government has 24-hour access, and I would like to give you 24-hour access, as well.

As for a separate place in Jefferson City, while that's a theoretical possibility, I think logistically it's unworkable.

COURTROOM DEPUTY: Judge, one of the parties has been disconnected.

MR. STABENOW: I was just proposing --

THE COURT: Wait just a minute because I want to include all parties.

(Telephone was re-connected.)

THE COURT: All right. Gentlemen, I was just indicating that the marshal's office will permit after-hour access. You will need to go through a briefing with them in advance, and it is no-fault liability. If you let somebody into this courthouse after hours, you're the ones who are liable for it. And we will just have the secure area here in this courthouse and not have a satellite secure area in Jefferson City. Okay.

The -- there was a dispute in the protective order about whether the defendants had a right to object to classification. And it was the government's position that only the government could classify or not classify a document. And

it appears to be the case, but I'm not going to have a provision that says they can't even object to it. They have a right to object to it. It doesn't mean they're going to be successful on that objection, but I'm not going to cut off their right to object to it.

Oral classifications. I know that the defendants had objected that if something is not in writing classified, they are concerned about miscommunication. Is that a fair statement, ladies and gentlemen?

MR. STABENOW: Yes, Your Honor.

THE COURT: That you don't want to go to jail because you released something that was an oral statement when, in fact, somebody just orally told you that it was classified.

MR. AISENBREY: Not only that they told us, they orally tell us this is classified; but the way this is written, we should know that it's classified without being told. That's where we really have a problem.

MR. STABENOW: We, of course, have no --

THE COURT: I know the concern, though, of the government is that I exercise due care in handling this material so that if, you know, common sense tells you that, gosh, this sure seems like something that maybe there's some confusion about that you get in touch with the government before you share that material.

MR. AISENBREY: Your Honor, of course. If common

sense tells you that there's an issue, then I agree. But it seems to me that everything classified is in that room. And the way this is written, if I'm having a conversation with Mr. Gonzalez in the hallway about an issue and he tells me something, I think I'm entitled to have him tell me, what I'm about to tell you is classified, not to simply have me infer that at my peril. That's my objection to it.

MR. STABENOW: Your Honor, part of our concern here is it's, without having reviewed the tapes, it's our suspicion that a lot of these classified materials, or the reasons for the classification deal with very public issues that we're all discussing anyway. And we don't want to have a situation where, say, I run into Mr. Gonzalez or Mr. Garrett in the hall and I say, what do you think about this case out in California, surveillance of people's e-mail? And then they mention something about FISA, and they're thinking it relates to the case and therefore, it's classified, and I'm thinking we're having a discussion about general societal issues, that's our fear. We just want something where they very clearly articulate, this is an issue I'm disclosing to you now -- you know.

THE COURT: Are you saying all you want is them to say it's classified, is that sufficient?

MR. AISENBREY: I'm speaking for myself. If I'm told it's classified, I can handle it. I'm objecting to my

having to infer that it is or conclude that it is. That's a problem.

THE COURT: How can we put some language in, though, that, makes sure it's clear that everybody has got to use common sense and not be negligent? I mean, inherently, I know that's what's going to occur.

MR. AISENBREY: I don't think you have to order us to not be negligent. I just think the government should be, that you should put in the order that if the government orally conveys information they believe to be classified, they should so advise whoever they're telling. And if that's there, I think we're all fine.

THE COURT: Okay.

MR. GONZALEZ: Except I don't think that's going to happen in a situation because we're not going to be running into each other in the hall where I'm going to be saying this is classified, by the way, because that's not an approved place for me to say it. If I'm in the room and tell them that, they can assume so.

THE COURT: Why can they assume that everything you tell them in the room is classified since it's the only place you talk about classified information? You may have to talk about both classified and unclassified information at the same time.

MR. GONZALEZ: You're correct, Judge. You're right.

MR. AISENBREY: In the hall was a bad example. But in the room, if it's a verbal communication of something that's classified, I think we have a right to be told, this is classified.

THE COURT: Mr. Gonzalez, what's wrong with you being required to tell them something is classified?

MR. GONZALEZ: I don't think there's anything wrong with being required to tell them that. But I think the reverse is true, to say that if they're not told it's unreasonable that they can then impart that to everyone else because the defense could be, look, we weren't told that that's classified.

THE COURT: Part of this has to do with who has the responsibility to, in fact, label something as classified, and I thought the government said you're the only ones that can do it.

MR. GONZALEZ: That's correct.

THE COURT: So if you're the only ones who can do it, why isn't it your responsibility to communicate to people that it's classified?

MR. GONZALEZ: I think generally that's done, but certain things are derivative which they would be required to not pass on.

THE COURT: Then why wouldn't you be required to tell them it's classified, don't pass it on.

MR. GONZALEZ: If I'm not aware that they're talking

about it, I think -- our concern isn't that we can't tell them something is classified.  It's that if there is an item of which we're not aware and then they can then say afterwards, we were not told about that, we never had a conversation about it, and we never had the opportunity to tell them that that particular item was.

THE COURT:  Well, if they find out some evidence in their investigation through some source other than the government, are you saying that they are responsible for figuring out whether it's classified?

MR. GONZALEZ:  No, I'm not.

THE COURT:  So where would they get this information other than from you?

MR. GONZALEZ:  I'm assuming -- again, we're talking about a pile of items which in their office, an item that leads to -- an item within the office that leads to a particular witness, which is, assuming that that's classified, approaching that witness to interview them is actually, and any information you get from them is, at least derivatively, classified.  So I don't think -- and that's something that we can't know that they're doing that.  Or if we do know it, maybe we can.  But I don't think --

THE COURT:  Well, the more you describe this, the more I understand why the defense is concerned about this because I'm not sure I understand under what circumstances they

40

would or would not be liable themselves for figuring out whether something should have been or is classified. If it hasn't even been reviewed by the government.

MR. GONZALEZ: I guess I'm not understanding what the court --

THE COURT: Your example was derivatively, they found some information as a result of other information and that somehow they should know that this new information that they found would be classified if the government knew about it? When you use the word derivative.

MR. GONZALEZ: Bad example. Let me withdraw that. I was actually thinking of a different example where we use --

THE COURT: Why can't you work together with each other to find out some kind of language that says if you communicate oral information, you need to tell them that it's classified and they're not responsible unless you tell them that it's classified. If you orally tell them something.

As to other information, they have some kind of good faith -- what is the correct word? Must take reasonable steps to check if it's classified or not, if a reasonable person would think that it was classified. Does that put too much burden on the defendant?

MR. AISENBREY: No, Your Honor. I think actually we would probably be more careful than less careful.

THE COURT: Because they're the government. They

41

don't get after themselves, they only get after other people.

MR. AISENBREY: I understand that. The problem that -- I think we're just talking about the oral issue right now. The next issue, and maybe it's on your list, is what I think Mr. Gonzalez was alluding to where I'm listening to my client talk on the phone -- and bear in mind, I expect at least one or more of these classified calls would be my client ordering a pizza.

But if he has a conversation with somebody and he and I talk about that and he says, you need to speak to Joe X or Y or Z because he can show you, he can explain to you that that conversation wasn't about what they say it's about, I should be able to go talk to X or Y or Z without that conversation becoming classified because I got the name from my client after he heard a call. And I think we need to know how that's going to work.

MR. GONZALEZ: I think the government's position is that that use can't, they can ask for a use, to use that particular conversation and go out and do interviews, but I do not think that they can use that conversation subsequently to go out and do an interview about the substance of that conversation because that conversation is itself classified. At this point. At this point.

THE COURT: That makes sense to me.

MR. GONZALEZ: That's at this point. I think we'll

get over that, quite honestly, with the court's order, we may get end up getting beyond that after the 30 days or whatever. But I just don't think there's a, that may not be an issue that we have to deal with at this point.

MR. AISENBREY: We probably need a concrete example, and the first time it comes up it will probably sort itself out.

THE COURT: How about putting in unless otherwise ordered by the court language as a prelude to what the government has asked for.

MR. AISENBREY: I think we understand. We can work it out.

THE COURT: Okay. Perfect. Now, there was some dispute about treating the government and the defendant equally in terms of how people had to use the classified information. I think it had to do with you had certain requirements and they didn't, the protective order doesn't say they're subject to the same requirements. Have I got that right, or is it just the question of --

MR. AISENBREY: I'm not sure, it was not an issue for me, Your Honor. I don't think Mr. Stabenow -- perhaps Mr. Bradshaw or Mr. Woods have a comment about that. It's in there, Your Honor, I know, but I don't remember where it came from.

THE COURT: Does anybody really dare, are we in a

tit-for-tat situation?

MR. AISENBREY:  I don't think it's a big deal.

THE COURT:  Then I'm not going to worry about it. Okay.  Then those are what I regarded as the big issues.  What other big issues do you think that we can globally resolve?

MR. STABENOW:  Mr. Stabenow for Mr. Mustafa.  One other issue was locations in which we could discuss the classified material that we had reviewed.  I'm quite familiar with the fact that I can't get on an unsecured line and call my investigator or call a fellow attorney and discuss it.  We can't walk down a public street and discuss classified information.

But I'm thinking of two examples.  One is my investigator and I drive up here from Jefferson City and we want to discuss it within our car as we're driving down the highway and we're in our law office and we want to discuss it in Jefferson City, what did you think of that tape the other night.  Those are situations where there is no means for anybody else to listen in on the conversation.  It is not a public forum.

And it has been my experience on all of the classified material I've worked with before that within the confines of our legal office or, for example, in the Army in the general's office, we did not have to interrupt the meeting to go down to the secure vault to discuss things, provided we

took reasonable precautions, we checked outside the window, we closed the door, we turned off the phone to make sure there's no way the public could listen in on those conversations.

THE COURT: In some ways, I think that relates back to the other issues because that may be what the government's rights are. I don't think that people not in the government have that right. It's my understanding that you can only discuss this classified information in the secured area, that you are not permitted to discuss it anywhere else.

And I think that's an issue of law. I don't think that's something I have any discretion on. If you show me I have discretion on it, we can discuss it, but my understanding is under CIPA, you can only discuss that information in the secure area. Because you can't --

Well, Miguel, have I got that right, does CIPA require that, or is that a requirement of the Department of Justice?

COURT SECURITY OFFICER: That's a requirement of the Department of Justice and the Central Intelligence Agency and all of these intelligence agencies. The problem with a car or your office, you're not guaranteed that that office is not being bugged or somebody passing by hears about it, so that's the concern. The information has to be in a secured room.

THE COURT: And I have now given you -- one of the reasons I've given you after-hour access, that was kind of quid

pro quo here, is that you're going to have to do your work in that room. Now, as we've said, and I hope -- I know that this is true. I know everybody here working on this case has the best interests of the United States government, of the United States in their heart. And I know that nobody would do anything inappropriate. But I think this is a rigid rule that requires defense counsel to discuss it inside the secured area.

By the same token, I think if, in fact, our interest is really getting this matter resolved so that we can address a threat to society, then it is best resolved sooner than later, and the more complications imposed by the government in classifying information that really isn't classified information at all, you know, I don't think that really supports the best interests of the community. But I assume that the government is just as interested in the welfare of this country as anybody else, and so I'm going to assume that, as well.

Bottom line is let's try to get it unclassified as quickly as possible so that we don't have all of these procedural hurdles if there's not really good reason for having it classified.

Anything else? Can I let you all go for lunch? Because here is the goal. Seven days from today, you all will return to me an agreed-upon protective order. And if there are some little, you know -- well, there wouldn't be anything

little because on little things I know you're going to get an agreement on. If there's some major thing that we've overlooked today, then we'll have a telephone conference to discuss it because I'd like to get this finished so we can get the classified information to you all so you can start identifying what kind of problems there are that we need to resolve.

MR. STABENOW: Your Honor, there is one issue not related to this, not related to the CIPA, or at least I don't believe it is. And that is I was just wondering, we had talked at a prior hearing about getting log records or log summaries that were not classified as soon as possible. I don't know if the government has, if it's their position that all of those are classified or not.

THE COURT: I'm not sure I know what you're talking about.

MR. GONZALEZ: I'm not sure I know what we're talking about either. But I will say that I think all of that is coming with the phone calls. I think all of that is part of the same item.

THE COURT: I thought there were the summaries, there were some summaries of the phone calls that were not, in fact, word-for-word translations, but they were summaries. That's actually what I was talking about earlier.

MR. GONZALEZ: I think those are classified,

actually, but again we're --

THE COURT: I would assume they are.

MR. GONZALEZ: We're providing all of that at the exact same time.

THE COURT: So the FBI has agreed to give those summaries to the defendant.

MR. GONZALEZ: The ones they have, and as they produce more, to give those out because they're doing little summaries prior to translating fully also, it's my understanding. So, again, when I say summaries, I want to be clear. It's not a great legal document. I mean, it's just generally what they called about.

THE COURT: Okay. Anything else, Mr. Bradshaw or Mr. Woods?

MR. BRADSHAW: This is Jean Paul Bradshaw. Nothing here.

MR. WOODS: Curtis Woods. Nothing here.

MR. STABENOW: Your Honor, Mr. Stabenow. When we're done with this hearing, could Mr. Gonzalez and I speak to you for two seconds?

THE COURT: Yes.

MR. GONZALEZ: Will we meet here in person next Wednesday? Are we talking about the newly agreed upon order?

THE COURT: Just submit it to me. Unless there's something in there that's not in the current order, I will sign

it, as long as the parties are in agreement, given the principles that we've discussed today.

MR. GONZALEZ: Okay. And if we have any problems, we can do a conference call.

THE COURT: If you have any problems, let me know as soon as possible after you've made a good faith effort to resolve it.

MR. GONZALEZ: Absolutely. Thank you, Judge.

THE COURT: Okay. Thank you.

(Hearing adjourned.)

- - -

- - -

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

January 20, 2010

/s/_____
Kathleen M. Wirt, RDR, CRR
U.S. Court Reporter