# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Criminal Action |
| v. | ) | No. 07-CR-00087-02-W-NKL |
| | ) | |
| MUBARAK HAMED, | ) | |
| | ) | |
| Defendant. | ) | |

## **PLEA AGREEMENT**

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the parties described below have entered into the following plea agreement:

1. **The Parties.** The parties to this agreement are the United States Attorney's Office for the Western District of Missouri (otherwise referred to as "the Government" or "the United States"), represented by Beth Phillips, United States Attorney, Assistant United States Attorney Anthony P. Gonzalez, Assistant United States Attorney Steven M. Mohlhenrich, and United States Department of Justice Trial Attorney Paul G. Casey, and Defendant MUBARAK HAMED ("Defendant"), represented by Curtis E. Woods and Charles D. Swift. Defendant understands and agrees that this plea agreement is only between him and the United States Attorney for the Western District of Missouri, and that it does not bind any other federal, state, or local prosecution authority or any other government agency, unless otherwise specified in this agreement.

2. **Defendant's Guilty Plea.** Defendant agrees to and hereby does plead guilty to Counts One (1), Ten (10) and Thirty-Three (33) of the Second Superseding Indictment. Count One

DEFENDANT INITIALS:    MH

charges Defendant with violation of 18 U.S.C. § 371, that is, conspiracy to violate 50 U.S.C.

§§ 1701-1706 (International Emergency Economic Powers Act). Count Ten charges Defendant

with violation of 50 U.S.C. §§ 1701-1706 (International Emergency Economic Powers Act).

Count Thirty-Three charges Defendant with violation of 26 U.S.C. § 7212(a) (Obstructing or

Impeding Administration of Internal Revenue Laws). By entering into this plea agreement,

Defendant admits that he knowingly and willfully committed these offenses, and is in fact guilty

of these offenses.

3. **Factual Basis for Guilty Plea.** The parties agree that the facts constituting the

offenses to which Defendant is pleading guilty are as follows:

**Background**

A. Defendant Mubarak Hamed (Hamed), a native of Sudan, is a naturalized United States citizen. Hamed first entered the United States in 1990, and lived in Columbia, Missouri from that time until the present.

B. From 1991 onward, Hamed was the chief executive of Defendant Islamic American Relief Agency (IARA), an Islamic charitable organization incorporated under Missouri law in 1985 and based in Columbia, Missouri. Originally, IARA was incorporated under the name "Islamic African Relief Agency-USA," and also was known as the Islamic African Relief Agency-United States Affiliate and IARA-USA. On August 27, 1987, IARA applied for recognition of tax exemption under Section 501(c)(3) of the Internal Revenue Code (Title 26, United States Code). On April 21, 1989, IARA was granted tax-exempt status. On May 25, 2000, the Islamic African Relief Agency-USA legally changed its name to the Islamic American Relief Agency.

C. IARA was part of an international organization having more than 40 international offices, which was headquartered in Khartoum, Sudan. That organization was known as the Islamic African Relief Agency, the Islamic Relief Agency, IARA, and ISRA.

D. In 1991, Hamed was appointed as the Chief Executive Officer of IARA in the United States. His title was later changed to Executive Director. Hamed ran the day-to-day operations of IARA, and was responsible for implementing the projects authorized by IARA's Board of Directors or with which IARA associated itself. Hamed spoke for

DEFENDANT INITIALS:    MH                    -2-

IARA, negotiated and entered cooperation agreements and contracts on its behalf, and authorized spending and payment for projects, materials, and travel. As a charity, IARA took in between $1 million and $3 million in contributions annually from 1991 to 2003. It also received funds from the United States Agency for International Development (USAID). During Hamed's tenure, IARA employed approximately six full-time employees, and an additional 10-12 part-time employees.

### IEEPA and Iraqi Sanctions Violations

E. Pursuant to authority granted in the International Emergency Economic Powers Act (IEEPA), on August 2, 1990, President George H.W. Bush issued Executive Order 12722, which declared a national emergency with respect to Iraq, and on August 9, 1990, issued Executive Order 12724, which empowered the Secretary of the Treasury to promulgate regulations to effect these Executive Orders. Pursuant in part to this authority, the Secretary of Treasury issued the Iraqi Sanctions Regulations, 31 C.F.R. § 575, which prohibited among other things a United States person from sending or transfer of money, funds and good, directly or indirectly to any person in or the government of Iraq, the unauthorized export of goods from the United States to a third country for reshipment to Iraq, any transaction which avoids or evades the Iraqi Sanctions Regulations, unauthorized travel to Iraq, and any conspiracy to violate or engage in any transaction prohibited by the Iraqi Sanctions Regulations. These sanctions continued in effect until May 23, 2003.

F. At all times while the Iraqi Sanctions were in place, Defendants Hamed and IARA were United States persons. Further, at no time while the Iraqi Sanctions were in place did Hamed or IARA have a license or any other legal authorization to send money, funds or items into Iraq.

G. As part of his duties as IARA's Executive Director, Hamed was directly responsible for implementing IARA's participation in all projects and activities, and authorizing all spending (as sole or co-signer), which included the issuing of all checks and money transfers to persons and organizations inside and outside the United States. In implementing IARA's participation in projects, it was also Hamed's responsibility to ensure that IARA had all necessary licenses and permissions to lawfully perform the business of IARA.

H. As IARA's Executive Director, Hamed was aware of and caused IARA to raise money for for transfer to persons in Iraq. In that regard, in 1996, Hamed hired Defendant Ahmed Mustafa (Mustafa) as a fund-raiser, with the understanding that Mustafa would concentrate his efforts on raising and securing funds which would ultimately be sent to Iraq. Mustafa worked at IARA until October 13, 2004.

I. Hamed explained to Mustafa and other IARA employees that the moneys collected for Iraq would be transferred via wire to Defendant Khalid Al-Sudanee

DEFENDANT INITIALS: _____MH_____                    -3-

(Al-Sudanee), who was in charge of the Amman, Jordan branch office of ISRA. Al-Sudanee would either take the cash sent to him into Iraq, and/or purchase items in Jordan and transport them into Iraq. Correspondence found in the IARA offices, and at Hamed's home, confirmed that during the time Iraqi Sanctions were in effect, funds were regularly sent (wired) to Al-Sudanee in Amman, Jordan, and that Al-Sudanee took the money, funds and/or items into Iraq.

J. On March 21, 2001, Hamed was sent, and he received, a letter from the Department of the Treasury, Office of Foreign Assets Control (OFAC) which, among other things, informed Hamed that they had a report, based in part upon information on IARA's website, that IARA appeared to be providing aid to persons inside Iraq, that was a licensing requirement to send aid to Iraq, and that IARA did not possess a license to provide aid or funds to Iraq. The letter asked for an accounting of IARA's efforts in Iraq and Sudan for the preceding five (5) years, and a response within 20 days. Hamed did not respond and, on August 1, 2001, OFAC again sent him a letter, which he received, informing Hamed that OFAC had a report, based in part upon information on IARA's website, that IARA appeared to be providing aid to persons inside Iraq, that there existed a licensing requirement to send aid to Iraq, and that IARA did not possess a license to provide aid or funds to Iraq. The letter asked for an accounting of IARA's efforts in Iraq and Sudan for the preceding five (5) years. Hamed responded to this letter on August 17, 2001, and knowingly and falsely stated to OFAC that IARA did not provide aid to anyone in Iraq, only to persons outside of Iraq.

K. Prior to March 21, 2001, Hamed had authorized and approved of all transfers funds to Al-Sudanee knowing that the money, and funds would be and were transferred from Jordan to Iraq. After March 21, 2001, Hamed continued to transfer money and funds from IARA accounts in Columbia, Missouri to Iraq through Amman, Jordan, including but not limited to, on December 18, 2001, Hamed authorized the transfer of $40,974.09 from an IARA account in Columbia Missouri, to an account controlled by Al-Sudanee in Amman, Jordan, which money was to go for and to go to persons in Iraq, as charged in Count Ten of the Second Superseding Indictment.

L. On October 13, 2004, IARA along with five individuals in the ISRA network, located overseas, was designated a Specially Designated Global Terrorist (SDGT) by OFAC. From that point, IARA could no longer receive contributions or use any of its property. Hamed was interviewed by federal agents on October 13, 2004. Hamed acknowledges that the Government could establish at trial that during that interview, he first admitted sending money to Iraq, and then denied sending it. Further, Hamed acknowledges the Government could also establish at trial that he told Mustafa to deny that the aid had been sent into Iraq. Hamed acknowledges that the Government could establish through evidence of these acts that he attempted to obstruct and impede the investigation. Later on that day, and in the following weeks, Hamed admitted to others

that IARA did send money, funds and items inside Iraq, and that he did not get the required licenses.

M. During the entire period in which the sanctions were in effect, IARA and Hamed used funds received as charitable contributions to engage in the prohibited transactions involving Iraq, as alleged in Counts Two (2) through Twelve (12) and Fourteen (14) through Twenty-Four (24) of the Second Superseding Indictment.

### Efforts to Remove IARA From the Senate Finance Committee List

N. On January 14, 2004, IARA was included on a United States Senate Finance Committee list identifying charities suspected of funding terrorism. Shortly thereafter, Hamed and the Board of Directors decided that IARA should hire a person or persons to advocate for IARA's removal from the list. On or about January 24, 2004, with the assistance of Defendant Mark Deli Siljander (Siljander), Hamed, on behalf of IARA, hired a former United States Congressman and registered lobbyist, hereinafter identified by the initials "R.P.H.," to advocate for IARA's removal from the list and reinstatement as an approved government contractor, by gathering information and meeting with individuals and agencies of the United States government. On January 24, 2004, Hamed signed a $15,000 check that was issued to R.P.H., drawn on IARA's principal bank account.

O. Between March and May, 2004, Hamed, on behalf of IARA, hired a second former United States Congressman, Siljander, who was not a registered lobbyist, to advocate for IARA's removal from the list and reinstatement as an approved government contractor, by gathering information and meeting with individuals and agencies of the United States government. Hamed's discussions with Siljander included two telephone conversations, which took place April 28, 2004, and May 6, 2004. In those conversations, Hamed and Siljander discussed the work Siljander was performing on behalf of IARA and agreed on a fee of $75,000. Regarding the method of payment for the services, Siljander told Hamed, ". . . I think we oughta do this number one through foundations and not professionally," and advised Hamed to transfer funds from IARA to himself by funneling them through nonprofit entities.

P. On May 27, 2004, Hamed signed a $25,000 check that was issued to Siljander, check no. 7095, drawn upon the IARA-USA, North Mali (CEWIGAP) account, which was made payable to an entity called the International Foundation. On August 26, 2004, Hamed signed two checks that were issued to Siljander, each in the amount of $12,500; the first, check no. 7097 was drawn upon the IARA-USA, North Mali (CEWIGAP) account, and was made payable to an entity called the National Heritage Foundation, and the second, check no. 1204 was drawn upon the IARA Mali Project account, and was also made payable to National Heritage Foundation.

DEFENDANT INITIALS: ___MH___      -5-

Q.  Since the indictment of this matter, Hamed has read Siljander's account describing the payments as being for the support of Siljander's writing a book about building "bridges" between Islam and Christianity.  This account is utterly false.  Hamed hired Siljander to perform a service for IARA:  to advocate for IARA's removal from the Senate Finance Committee List, and reinstatement as an approved recipient of United States funds.  Hamed never discussed with Siljander the writing of a book, and would not have spent $75,000 of IARA's funds for such a purpose.

**Obstructing and Impeding the Administration of the Internal Revenue Laws**

R.  One mission of the IRS was to oversee the operation of organizations exempt from income tax under Section 501(c)(3) of the Internal Revenue Code (Title 26, United States Code).  In accomplishing this mission, the IRS primarily relied upon information reported annually by each tax-exempt organization on IRS Forms 990, Return of Organization Exempt from Income Tax, detailing the organization's income, expenses and activities during the calender year.  Additionally, in determining an organization's entitlement to tax-exempt status, the IRS utilized information provided by tax exempt organizations in response to specific IRS inquiries, information provided by other federal and state agencies, and members of the public.

S.  By pleading guilty to Count Thirty-Three, Hamed admits that beginning at least as early as January 1, 1997, and continuing until October 13, 2004, he corruptly endeavored to impair and impede the due administration of the Internal Revenue laws by using IARA's tax-exempt status to solicit funds, representing that they were legitimate charitable contributions, and to misuse part of those funds by transferring those funds to Iraq, a purpose prohibited by law as alleged in Counts One through Twelve, Fourteen through Twenty-Four, and in many similar uncharged transactions.  In fact, during the entire period in which the Iraq sanctions were in effect, Hamed IARA solicited donations through various means, including pamphlets, flyers, newsletters and personal correspondence, requesting contributions to pay for projects in Iraq.  Most of these solicitations specifically referenced the defendant IARA's tax-exempt status under Section 501(c)(3) by including the statement, "Make your tax-deductible donation to: IARA - USA," or words to that effect.  Additionally, the solicitations sometimes specifically referenced the tax identification number assigned to the IARA by the Internal Revenue Service  (IRS).  Further, IARA accepted monetary contributions specifically designated for projects in Iraq.

T.  Further, Hamed admits that he continued the corrupt endeavor by omitting from IARA's IRS Forms 990 relevant, material information regarding IARA's transactions with persons and entities in Iraq, and regarding IARA's control, history and affiliations.  For each year 1997 through 2003, Hamed filed or caused to be filed IRS Forms 990, Return of Organization Exempt From IncomeTax.  On each such form, which required in Part III, Statement of Program Service Accomplishments that they detail all of their exempt purpose expenses, Hamed knowingly failed to disclose the fact that he and

DEFENDANT INITIALS:    MH                          -6-

IARA had provided funds for projects and persons in Iraq. Further, on each such form, in response to Question 80a, which asked: "Is the organization related (other than by association with a statewide or nationwide organization) through common membership, governing bodies, trustees, officers, etc., to any other exempt or nonexempt organization?" falsely answered "no," and failed to disclose IARA's relationship to the Islamic Relief Agency (ISRA), also known as the Islamic African Relief Agency, headquartered in Khartoum, Sudan, and to the ISRA branch office located in Amman, Jordan.

U. Further, Hamed admits that as a part of his corrupt endeavor, on or about November 6, 2001, he instructed a spokesman for IARA to engage in a television interview to falsely claim that a certain individual had never been an employee of IARA, when in fact, Hamed personally had hired that individual as an IARA employee. Hamed admits that he instructed the spokesperson to falsely deny the association so as to avoid IARA coming under increased scrutiny from the government and public, and to avoid deterring potential donors from contributing to IARA.

V. Finally, Hamed admits that on October 13, 2004, during an interview with agents of the IRS, he falsely stated that they had not transferred funds to Iraq while the sanctions were still in effect, and that funds were only used for Iraqi refugees located in Jordan. Further, to conceal the true nature of IARA's relationship with ISRA, Hamed falsely stated that he had applied for a job with IARA in Columbia, Missouri, and did not disclose that, on or about April 18, 1990, he had been transferred by the entity located in Khartoum, Sudan, to the Columbia, Missouri branch office.

4. **Use of Factual Admissions and Relevant Conduct.** Defendant acknowledges, understands and agrees that the admissions contained in Paragraph 3 and other portions of this plea agreement will be used for the purpose of determining his guilt and advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G."), including the calculation of Defendant's offense level in accordance with U.S.S.G. § 1B1.3(a)(2). Defendant acknowledges, understands and agrees that the conduct charged in any dismissed counts of the indictment as well as all other uncharged related criminal activity may be considered as "relevant conduct" pursuant to U.S.S.G. § 1B1.3(a)(2) in calculating the offense level for the charges to which he is pleading guilty.

DEFENDANT INITIALS: ___MH___                 -7-

**5. <u>Statutory Penalties</u>.**

A.  Defendant understands that upon his plea of guilty to Count One, charging him with 18 U.S.C. § 371, that is, Conspiracy to Violate 50 U.S.C. §§ 1701-1706 (International Emergency Economic Powers Act), the maximum penalty the Court may impose is not more than five (5) years of imprisonment, a fine of up $250,000 or, alternatively, a fine of not more than the greater of twice the gross gain or twice the gross loss,  a three (3) year term of supervised release, and a $100 mandatory special assessment which must be paid in full at the time of sentencing.  Defendant further understands that this offense is a Class D felony.

B.  Defendant understands that upon his plea of guilty to Count Ten, charging him with 50 U.S.C. §§ 1701-1706 (International Emergency Economic Powers Act), the maximum penalty the Court may impose is not more than ten (10) years of imprisonment, a fine of $50,000 or, alternatively, in an amount not greater than twice the gross gain or twice the gross loss, a three (3) year term of supervised release, and a $100 mandatory special assessment which must be paid in full at the time of sentencing.  Defendant further understands that this offense is a Class C felony.

C.  Defendant understands that upon his plea of guilty to Count Thirty-Three, charging him with 26 U.S.C. § 7212(a) (Obstructing or Impeding Administration of Internal Revenue Laws), the maximum penalty the Court may impose is not more than three (3) years of imprisonment, a fine of $250,000 or, alternatively, in an amount not more than the greater of twice the gross gain or twice the gross loss,  a one (1) year term of supervised release, and a $100 mandatory special assessment which must be paid in full at the time of sentencing.  Defendant further understands that this offense is a Class E felony.

**6. <u>Sentencing Procedures</u>.**  Defendant acknowledges, understands and agrees to the following:

A.  In determining the appropriate sentence, the Court will consult and consider the United States Sentencing Guidelines promulgated by the United States Sentencing Commission; these Guidelines, however, are advisory in nature, and the Court may impose a sentence either less than or greater than Defendant's applicable Guidelines range, unless the sentence imposed is "unreasonable;"

B.  The Court will determine Defendant's applicable Sentencing Guidelines range at the time of sentencing;

C.  In addition to a sentence of imprisonment, the Court may impose a term of supervised release of up to three years;  the Court must impose a period of

DEFENDANT INITIALS:  MH                      -8-

supervised release if a sentence of imprisonment of more than one year is imposed;

D.  If Defendant violates a condition of his supervised release, the Court may revoke his supervised release and impose an additional period of imprisonment of up to two years without credit for time previously spent on supervised release.  In addition to a new term of imprisonment, the Court also may impose a new period of supervised release, the length of which cannot exceed three years, less the term of imprisonment imposed upon revocation of Defendant's first supervised release;

E.  The Court may impose any sentence authorized by law, including a sentence that is outside of, or departs from, the applicable Sentencing Guidelines range;

F.  Any sentence of imprisonment imposed by the Court will not allow for parole;

G.  The Court is not bound by any recommendation regarding the sentence to be imposed or by any calculation or estimation of the Sentencing Guidelines range offered by the parties or the United States Probation Office; and

H.  Defendant may not withdraw his guilty plea solely because of the nature or length of the sentence imposed by the Court.

**7.  Government's Agreements.**  Based upon evidence in its possession at this time, the United States Attorney's Office for the Western District of Missouri, as part of this plea agreement, agrees not to bring any additional charges against defendant for any federal criminal offenses related to the conduct charged in the Second Superseding Indictment, for which it has venue and which arose out of Defendant's conduct described above.  Additionally, the United States Attorney for the Western District of Missouri agrees to dismiss Counts Two through Nine (2-9), Eleven through Thirty-One (11-31), Thirty-Four through Forty-One (34-41), and the Forfeiture Allegation at sentencing.

DEFENDANT INITIALS:    MH                              -9-

Defendant understands that this plea agreement does not foreclose any prosecution for an act of murder or attempted murder, an act or attempted act of physical or sexual violence against the person of another, or a conspiracy to commit any such acts of violence or any criminal activity of which the United States Attorney for the Western District of Missouri has no knowledge.

Defendant recognizes that the United States' agreement to forego prosecution of all of the criminal offenses with which Defendant might be charged is based solely on the promises made by Defendant in this agreement. If Defendant breaches this plea agreement, the United States retains the right to proceed with the original charges and any other criminal violations established by the evidence. Defendant expressly waives his right to challenge the initiation of the dismissed or additional charges against him if he breaches this agreement. Defendant expressly waives his right to assert a statute of limitations defense if the dismissed or additional charges are initiated against him following a breach of this agreement. Defendant further understands and agrees that if the Government elects to file additional charges against him following his breach of this plea agreement, he will not be allowed to withdraw his guilty plea.

**8. <u>Preparation of Presentence Report</u>.** Defendant understands the United States will provide to the Court and the United States Probation Office a government version of the offense conduct. This may include information concerning the background, character, and conduct of Defendant, including the entirety of his criminal activities. Defendant understands these disclosures are not limited to the counts to which he has pleaded guilty. The United States may respond to comments made or positions taken by Defendant or Defendant's counsel and to correct any misstatements or inaccuracies. The United States further reserves its right to make

DEFENDANT INITIALS: _____MH_____          -10-

any recommendations it deems appropriate regarding the disposition of this case, subject only to any limitations set forth in this plea agreement.  The United States and Defendant expressly reserve the right to speak to the Court at the time of sentencing pursuant to Rule 32(i)(4) of the Federal Rules of Criminal Procedure.

9.  **Withdrawal of Plea.**  Either party reserves the right to withdraw from this plea agreement for any or no reason at any time prior to the entry of Defendant's plea of guilty and its formal acceptance by the Court.  In the event of such withdrawal, the parties will be restored to their pre-plea agreement positions to the fullest extent possible.  However, after the plea has been formally accepted by the Court, Defendant may withdraw his pleas of guilty only if the Court rejects the plea agreement or if Defendant can show a fair and just reason for requesting the withdrawal.  Defendant understands that if the Court accepts his plea of guilty and this plea agreement but subsequently imposes a sentence that is outside Defendant's applicable Sentencing Guidelines range, or imposes a sentence that Defendant does not expect, like or agree with, he will not be permitted to withdraw his plea of guilty.

10.  **Agreed Guidelines Applications.**  With respect to the application of the Sentencing Guidelines to this case, the parties stipulate and agree as follows:

A.  The Sentencing Guidelines do not bind the Court and are advisory in nature.  The Court may impose a sentence that is either above or below Defendant's applicable Guidelines range, provided the sentence imposed is not "unreasonable;"

B.  For Counts One and Ten, the applicable Guidelines section is U.S.S.G. § 2M5.1(a) (1), which provides for a base offense level of 26.  Further, Defendant willfully obstructed and impeded, and attempted to obstruct and impede, the administration of justice with respect to the investigation of the instant offenses, and the obstructive conduct related to Defendant's offenses of conviction, warranting a two-level increase pursuant to U.S.S.G. § 3C1.1;

DEFENDANT INITIALS:     MH                                    -11-

C. For Count Thirty-Three, the applicable Guidelines section is U.S.S.G. § 2J1.2, which provides for a base offense level of 14. Further, the offense was extensive in scope, planning and preparation, warranting a two-level increase pursuant to U.S.S.G. § 2J1.2(b)(3)(C);

D. The parties agree that no offense levels are added by operation of the grouping rules, U.S.S.G., Part D;

E. Defendant has admitted his guilt and clearly accepted responsibility for his actions. Consequently, he is entitled to a two-level reduction pursuant to § 3E1.1(a) of the Sentencing Guidelines;

F. Defendant's criminal history category appears to be Category I. The parties agree that the Court will determine his applicable criminal history category after receipt of the presentence investigation report prepared by the United States Probation Office;

G. Defendant understands that the estimate of the parties with respect to the Guidelines computation set forth in the subsections of this paragraph does not bind the Court or the United States Probation Office with respect to the appropriate Guidelines levels. Additionally, the failure of the Court to accept these stipulations will not, as outlined in Paragraph 9 of this plea agreement, provide Defendant with a basis to withdraw his plea of guilty;

H. The United States agrees not to seek an upward departure from the Guidelines or a sentence outside the Guidelines range, and defendant agrees to not seek a downward departure from the Guidelines or a sentence outside the Guidelines range. The agreement by the parties to not seek a departure from the Guidelines is not binding upon the Court or the United States Probation Office and the Court may impose any sentence authorized by law, including any sentence outside the applicable Guidelines range that is not "unreasonable;"

I. Defendant consents to judicial fact-finding by a preponderance of the evidence for all issues pertaining to the determination of Defendant's sentence, including the determination of any mandatory minimum sentence (including the facts that support any specific offense characteristic or other enhancement or adjustment), and any legally authorized increase above the normal statutory maximum. Defendant waives any right to a jury determination beyond a reasonable doubt of all facts used to determine and enhance the sentence imposed, and waives any right to have those facts alleged in the indictment. Defendant also agrees that the Court, in finding the facts relevant to the imposition of sentence, may consider any reliable information, including hearsay; and

DEFENDANT INITIALS: ___MH___                     -12-

J.  Defendant understands and agrees that the factual admissions contained in Paragraph 3 of this plea agreement, and any admissions that he will make during his plea colloquy, support the imposition of the agreed-upon Guidelines calculations contained in this agreement.

11.  **Effect of Non-Agreement on Guidelines Applications.**  The parties understand, acknowledge and agree that there are no agreements between the parties with respect to any Sentencing Guidelines issues other than those specifically listed in Paragraph 10, and its subsections.  As to any other Guidelines issues, the parties are free to advocate their respective positions at the sentencing hearing.

12.  **Change in Guidelines Prior to Sentencing.**  Defendant agrees that if any applicable provision of the Guidelines changes after the execution of this plea agreement, then any request by defendant to be sentenced pursuant to the new Guidelines will make this plea agreement voidable by the United States at its option.  If the Government exercises its option to void the plea agreement, the United States may charge, reinstate, or otherwise pursue any and all criminal charges that could have been brought but for this plea agreement.

13.  **Government's Reservation of Rights.**  Defendant understands that the United States expressly reserves the right in this case to:

A.  Oppose or take issue with any position advanced by defendant at the sentencing hearing which might be inconsistent with the provisions of this plea agreement;

B.  Comment on the evidence supporting the charge[s] in the Second Superseding Indictment;

C.  Oppose any arguments and requests for relief Defendant might advance on an appeal from the sentences imposed and that the United States remains free on appeal or collateral proceedings to defend the legality and propriety of the sentence actually imposed, even if the Court chooses not to follow any recommendation made by the United States; and

DEFENDANT INITIALS:    MH                        -13-

D. Oppose any post-conviction motions for reduction of sentence, or other relief.

**14. Waiver of Constitutional Rights.** Defendant, by pleading guilty, acknowledges that he has been advised of, understands, and knowingly and voluntarily waives the following rights:

A. The right to plead not guilty and to persist in a plea of not guilty;

B. The right to be presumed innocent until his guilt has been established beyond a reasonable doubt at trial;

C. The right to a jury trial, and at that trial, the right to the effective assistance of counsel;

D. The right to confront and cross-examine the witnesses who testify against him;

E. The right to compel or subpoena witnesses to appear on his behalf; and

F. The right to remain silent at trial, in which case his silence may not be used against him.

Defendant understands that by pleading guilty, he waives or gives up those rights and that there will be no trial. Defendant further understands that if he pleads guilty, the Court may ask him questions about the offense or offenses to which he pleaded guilty, and if Defendant answers those questions under oath and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making a false statement. Defendant also understands he has pleaded guilty to a felony offense and, as a result, will lose his right to possess a firearm or ammunition and might be deprived of other rights, such as the right to vote or register to vote, hold public office, or serve on a jury.

**15. Waiver of Appellate and Post-Conviction Rights.**

A. Defendant acknowledges, understands and agrees that by pleading guilty pursuant to this plea agreement he waives his right to appeal or collaterally

DEFENDANT INITIALS: ___MH___         -14-

attack a finding of guilt following the acceptance of this plea agreement, except on grounds of (1) ineffective assistance of counsel; or (2) prosecutorial misconduct.

B.  Defendant expressly waives his right to appeal his sentence, directly or collaterally, on any ground except claims of (1) ineffective assistance of counsel; (2) prosecutorial misconduct; or (3) an illegal sentence.  An "illegal sentence" includes a sentence imposed in excess of the statutory maximum, but does *not* include less serious sentencing errors, such as a misapplication of the Sentencing Guidelines, an abuse of discretion, or the imposition of an unreasonable sentence. However, if the United States exercises its right to appeal the sentence imposed as authorized by 18 U.S.C. § 3742(b), Defendant is released from this waiver and may, as part of the Government's appeal, cross-appeal his sentence as authorized by 18 U.S.C. § 3742(a) with respect to any issues that have not been stipulated to or agreed upon in this agreement.

## 16.  **Financial Obligations.**

By entering into this plea agreement, Defendant represents that he understands and agrees

to the following financial obligations:

A.  The Court may order restitution to the victims of the offense to which Defendant is pleading guilty.  Defendant agrees that the Court may order restitution in connection with the conduct charged in any counts of the indictment which are to be dismissed and all other uncharged related criminal activity;

B.  The United States may use the Federal Debt Collection Procedures Act and any other remedies provided by law to enforce any restitution order that may be entered as part of the sentence in this case and to collect any fine;

C.  Defendant will fully and truthfully disclose all assets and property in which he has any interest, or over which Defendant exercises control directly or indirectly, including assets and property held by a spouse, nominee or other third party.  Defendant's disclosure obligations are ongoing, and are in force from the execution of this agreement until Defendant has satisfied the restitution order in full;

D.  Within 10 days of the execution of this plea agreement, at the request of the USAO, Defendant agrees to execute and submit  (1) a Tax Information Authorization form; (2) an Authorization to Release Information; (3) a completed financial disclosure statement; and (4) copies of financial information that Defendant submits to the U.S. Probation Office.  Defendant understands that compliance with these requests will be taken into account when the United States

DEFENDANT INITIALS:  ___MH___              -15-

makes a recommendation to the Court regarding Defendant's acceptance of responsibility;

E. At the request of the USAO, Defendant agrees to undergo any polygraph examination the United States might choose to administer concerning the identification and recovery of substitute assets and restitution;

F. Defendant hereby authorizes the USAO to obtain a credit report pertaining to him to assist the USAO in evaluating Defendant's ability to satisfy any financial obligations imposed as part of the sentence;

G. Defendant understands that a Special Assessment will be imposed as part of the sentence in this case. Defendant promises to pay the Special Assessment of $300 by submitting a satisfactory form of payment to the Clerk of the Court prior to appearing for the sentencing proceeding in this case. Defendant agrees to provide the Clerk's receipt as evidence of his fulfillment of this obligation at the time of sentencing;

H. Defendant certifies that he has made no transfer of assets or property for the purpose of (1) evading financial obligations created by this Agreement; (2) evading obligations that may be imposed by the Court; nor (3) hindering efforts of the USAO to enforce such financial obligations. Moreover, Defendant promises that he will make no such transfers in the future; and

I. In the event the United States learns of any misrepresentation in the financial disclosure statement, or of any asset in which Defendant had an interest at the time of this plea agreement that is not disclosed in the financial disclosure statement, and in the event such misrepresentation or nondisclosure changes the estimated net worth of Defendant by ten thousand dollars ($10,000.00) or more, the United States may at its option: (1) choose to be relieved of its obligations under this plea agreement; or (2) let the plea agreement stand, collect the full forfeiture, restitution, and fines imposed by any criminal or civil judgment, and also collect 100% (one hundred percent) of the value of any previously undisclosed assets. Defendant agrees not to contest any collection of such assets. In the event the United States opts to be relieved of its obligations under this plea agreement, Defendant's previously entered pleas of guilty shall remain in effect and cannot be withdrawn.

**17. <u>Waiver of FOIA Request</u>.** Defendant waives all of his rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case including,

DEFENDANT INITIALS: ___MH___       -16-

without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

18. **Waiver of Claim for Attorney's Fees.** Defendant waives all of his claims under the Hyde Amendment, 18 U.S.C. § 3006A, for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

19. **Defendant's Agreement to Destruction of Biological Evidence.** In accordance with 18 U.S.C. § 3600A(c)(2), Defendant knowingly and voluntarily waives his right to request DNA testing of any biological evidence which may have been obtained or seized by law enforcement in his case. Defendant agrees that all biological evidence which may have been obtained or seized may be destroyed by law enforcement authorities.

20. **Defendant's Breach of Plea Agreement.** If Defendant commits any crimes, violates any conditions of release, or violates any term of this plea agreement between the signing of this plea agreement and the date of sentencing, or fails to appear for sentencing, or if Defendant provides information to the Probation Office or the Court that is intentionally misleading, incomplete, or untruthful, or otherwise breaches this plea agreement, the United States will be released from its obligations under this agreement. Defendant, however, will remain bound by the terms of the agreement, and will not be allowed to withdraw his plea of guilty.

Defendant also understands and agrees that in the event he violates this plea agreement, all statements made by him to law enforcement agents subsequent to the execution of this plea agreement, any testimony given by him before a grand jury or any tribunal or any leads from such statements or testimony shall be admissible against him in any and all criminal proceedings. Defendant waives any rights that he might assert under the United States Constitution, any

DEFENDANT INITIALS: ___MH___                                    -17-

statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that pertains to the admissibility of any statements made by him subsequent to this plea agreement.

21. **Defendant's Representations.**  Defendant acknowledges that he has entered into this plea agreement freely and voluntarily after receiving the effective assistance, advice and approval of counsel.  Defendant acknowledges that he is satisfied with the assistance of counsel, and that counsel has fully advised him of his rights and obligations in connection with this plea agreement.  Defendant further acknowledges that no threats or promises, other than the promises contained in this plea agreement, have been made by the United States, the Court, his attorneys or any other party to induce him to enter his plea of guilty.

22. **Immigration Consequences.**  Defendant understands that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States, or he committed certain offenses before he became a naturalized citizen of the United States.  Under federal law, a broad range of crimes are removable offenses, including the offenses to which defendant is pleading guilty.  Indeed, because Defendant is pleading guilty to violation of 50 U.S.C. §§ 1701-1706 (International Emergency Economic Powers Act) and violation of 26 U.S.C. § 7212(a) (Obstructing or Impeding Administration of Internal Revenue Laws), removal is presumptively mandatory.  Removal and other immigration consequences are the subject of a separate proceeding, however, and Defendant understands that no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on his immigration status.  Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his guilty plea may entail, even if the consequence is his

DEFENDANT INITIALS:   MH            -18-

automatic removal from the United States. Further, Defendant understands that he is bound by his guilty plea regardless of any immigration consequences of the plea and regardless of any advice Defendant has received from his counsel or others regarding those consequences. Accordingly, Defendant waives any and all challenges to his guilty plea and to his sentence based on those consequences, and agrees not to seek to withdraw his guilty plea, or to file a direct appeal or collateral attack of any kind challenging his guilty plea, conviction or sentence, based on the immigration consequences of his guilty plea, conviction and sentence.

**23. No Undisclosed Terms.** The United States and defendant acknowledge and agree that the above-stated terms and conditions, together with any written supplemental agreement that might be presented to the Court in camera, constitute the entire plea agreement between the parties, and that any other terms and conditions not expressly set forth in this agreement or any written supplemental agreement do not constitute any part of the parties' agreement and will not be enforceable against either party.

DEFENDANT INITIALS:   MH   -19-

**24.  <u>Standard of Interpretation</u>.**  The parties agree that, unless the constitutional implications inherent in plea agreements require otherwise, this plea agreement should be interpreted according to general contract principles and the words employed are to be given their normal and ordinary meanings.  The parties further agree that, in interpreting this agreement, any drafting errors or ambiguities are not to be automatically construed against either party, whether or not that party was involved in drafting or modifying this agreement.

BETH PHILLIPS
United States Attorney


Dated:     6/25/2010          /S/ ANTHONY P. GONZALEZ
ANTHONY P. GONZALEZ
Assistant United States Attorney


Dated:     6/25/2010          /S/ STEVEN M. MOHLHENRICH
STEVEN M. MOHLHENRICH
Assistant United States Attorney


Dated:     6/25/2010          /S/ PAUL G. CASEY
PAUL G. CASEY  BY APG
Trial Attorney, Counterterrorism Section
National Security Division, U.S. Dept. of Justice

DEFENDANT INITIALS:     MH          -20-

I have consulted with my attorneys and fully understand all of my rights with respect to the offenses charged in the Indictment.  Further, I have consulted with my attorneys and fully understand my rights with respect to the provisions of the Sentencing Guidelines.  I have read this plea agreement and carefully reviewed every part of it with my attorneys.  I understand this plea agreement and I voluntarily agree to it.


Dated: _____6/25/2010_____     /s/ MUBARAK HAMED_____
                                MUBARAK HAMED
                                Defendant


We are Defendant MUBARAK HAMED's attorneys.  We have fully explained to him his rights with respect to the offenses charged in the Second Superseding Indictment.  Further, we have reviewed with him the provisions of the Sentencing Guidelines which might apply in this case.  We have carefully reviewed every part of this plea agreement with him.  To our knowledge, MUBARAK HAMED's decision to enter into this plea agreement is an informed and voluntary one.


Dated: _____6/25/2010_____     /s/ CURTIS E. WOODS_____
                                CURTIS E. WOODS
                                Attorney for Defendant


Dated: _____6/25/2010_____     /s/ CHARLES D. SWIFT_____
                                CHARLES D. SWIFT
                                Attorney for Defendant


DEFENDANT INITIALS: ___MH___          -21-