IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 07-00087-02-CR-W-NKL |
| | ) | June 25, 2010 |
| V. | ) | Kansas City, Missouri |
| | ) | CRIMINAL |
| MUBARAK HAMED, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

TRANSCRIPT OF CHANGE OF PLEA

BEFORE THE HONORABLE NANETTE K. LAUGHREY
UNITED STATES DISTRICT JUDGE

Proceedings recorded by electronic stenography
Transcript produced by computer

APPEARANCES

For Plaintiff:       MR. ANTHONY PETER GONZALEZ
                     United States Attorney's Office
                     80 Lafayette Street, Suite 2100
                     Jefferson City, MO 65101

                     MR. STEVEN M. MOHLHENRICH
                     United States Attorney's Office
                     901 St. Louis Street, Suite 500
                     Springfield, MO 65806-2511

For Defendant:       MR. CURTIS E. WOODS
                     Dentons US LLP
                     4520 Main Street, Suite 1100
                     Kansas City, MO 64110

                     MR. AHMED GHAPPOUR
                     Attorney at Law
                     P.O.  Box 20367
                     Seattle, WA 98102

                     MR. CHARLES D. SWIFT
                     Constitutional Law Center for
                     Muslims in America
                     833 E. Arapaho Rd., Suite 102
                     Richardson, TX 75081

Kathleen M. Wirt, RDR, CRR
United States Court Reporter
400 E. 9th Street, Suite 7452 * Kansas City, MO 64106
816.512.5608

JUNE 25, 2010

- - -

THE COURT: This is the matter of the United States versus Mubarak Hamed, Case No. 07-87. Is the government ready to proceed?

MR. GONZALEZ: Yes, we are, Your Honor. Anthony Gonzalez on behalf of the United States, and Mr. Mohlhenrich is also here for the United States.

THE COURT: And is the defendant ready to proceed?

MR. WOODS: Yes, Your Honor. Curtis Woods, Charles Swift, and Ahmed Ghappour on behalf of Mubarak Hamed.

THE COURT: All right. Thank you. Mr. Woods, it's my understanding that Mr. Hamed is going to plead guilty to Counts One, Ten, and Thirty-Three of the Second Superseding Indictment. Is that correct?

MR. WOODS: That's correct, Your Honor.

THE COURT: Would you please have him take the witness stand after being sworn in?

- - -

MUBARAK HAMED, being first duly sworn by the courtroom deputy, testified as follows:

THE COURT: I want to make sure you understand that you have sworn to tell the truth. Is that correct?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. You may take a seat.

- - -

EXAMINATION

By the Court:

Q.      You may be seated.

A.      Okay.  Thank you, Your Honor.

Q.      Are you Mubarak Hamed?

A.      Yes, Your Honor.

Q.      Mr. Hamed, you have been charged in the Second Superseding Indictment in Count One that, beginning on or about March 1991, and continuing until in or around May 2005, in the Western District of Missouri and elsewhere, the defendants, IARA, Mubarak Hamed, Khalid Al-Sudanee, Ali Mohamed Bagegni, and Ahmad Mustafa, and others, known and unknown to the grand jury, knowingly and willfully conspired, confederated and agreed to violate Executive Orders 12722 and 12724 and the Iraq Sanctions Regulations by transferring, attempting to transfer, and causing to be transferred, funds from the United States to Iraq, by and through Amman, Jordan, which transfers were subject to Executive Orders 12722 and 12724 and the Iraqi Sanctions Regulations, in violation of Title 50, United States Code, Sections 1701 through 1706, and Title 31, Code of Federal Regulations, Section 575.210.

Do you understand that charge against you?

A.      Yes, Your Honor.

Q.    In Count Ten, you have been charged that on or about December 18, 2001, and in the approximate amount of $40,974.09, in the Western District of Missouri and elsewhere, the Defendants IARA, Mubarak Hamed, Ali Mohamed Bagegni, and Khalid Al-Sudanee, aided and abetted by each other, knowingly and willfully violated Executive Orders 12722 and 12724 and the Iraqi Sanctions Regulations by participating in this transaction involving the transfer and attempted transfer of funds, again, in the amount of $40,974.09, from the United States to Iraq, by and through Amman, Jordan, which orders were subject to Executive Orders 12722 and 12724 and the Iraqi Sanctions Regulations.  All in violation of Title 50, United States Code, Sections 1701 to 1706; Title 31, Code of Federal Regulations, Section 575.210; and Title 18, United States Code, Section 2.

          Do you understand that charge against you?

A.    Yes, Your Honor.

Q.    And you have been charged in Count Thirty-Three that beginning on or about January 1, 1997, and continuing until on or about October 13, 2004, in the Western District of Missouri and elsewhere, the Defendants IARA and Mubarak Hamed did corruptly endeavor to impair and impede the due administration of the Internal Revenue laws by using the Defendant IARA's tax-exempt status to solicit funds, representing that they were legitimate charitable contributions, and to misuse part of

those funds by transferring those funds to Iraq and to Pakistan for the benefit of a Specifically Designated Global Terrorist, Gulbuddin Hekmatyar -- G-U-L-B-U-D-D-I-N, Hekmatyar, H-E-K-M-A-T-Y-A-R -- under purposes prohibited by law and for other purposes not in furtherance of the Defendant IARA's purported charitable mission.

The Defendants IARA and Mubarak Hamed continued their corrupt endeavor by omitting from IARA's IRS Forms 990 their transactions with persons and entities in Iraq and Pakistan, failing to disclose relevant requested information regarding the control, history, and affiliations of the Defendant IARA, making false public statements, and making false statements to agents and officials of the United States government.

I note that the U.S. Attorney is standing.

MR. GONZALEZ: Judge, I was actually standing just because I think it's usually my practice to do that, but I also would have stood anyway because I did want to make a correction to what I believe the Court's reading to Mr. Hamed.

THE COURT: Okay.

MR. GONZALEZ: The Court had actually read a part of this case regarding Gulbuddin Hekmatyar, the SDGT. That actually was redacted for purposes -- due to earlier motions that we had before the Court, and that was to be tried at a different time. And so that's actually not a part of what this

plea -- while it was part of the charge legitimately, it's not really a part of what he's admitting as to the tax charge.

THE COURT: Let me clarify the parameters of this plea. Is this a plea that will resolve all matters?

MR. GONZALEZ: Yes, Judge.

THE COURT: Including this allegation that I just read, but he's not admitting to it?

MR. WOODS: With respect to Pakistan, that's correct.

THE COURT: Yes.

MR. GONZALEZ: Yes, Judge.

THE COURT: All right.

MR. GONZALEZ: Yes, Judge. And it will resolve all of those. We'll be dismissing that section of the case, assuming that everything --

THE COURT: All right. What section of this, then, is he going to plead guilty to?

MR. GONZALEZ: Judge, everything that the Court read, except that one section that you mentioned about Gulbuddin Hekmatyar, the SDGT. It's just that one little paragraph that deals with --

THE COURT: Let me review it, and then I'll --

MR. WOODS: Those are the counts that you had severed earlier, Your Honor, and those are being disposed of by the agreement with the government.

THE COURT: Right. But Count Thirty-Three is, he's going to plead guilty to.

MR. GONZALEZ: Yes, Judge.

THE COURT: And what I just read is in Thirty-Three, so I'm going to try to take that part out.

MR. GONZALEZ: Yes, Judge.

THE COURT: Hold on just a minute. Is it correct, then, what he's really pleading guilty to is representing that they were legitimate charitable contributions and to misuse part of those funds by transferring those funds to Iraq for purposes not in furtherance of the Defendant IARA's purported charitable mission?

MR. GONZALEZ: That would be part of it. And I believe there's a couple of other things that he would agree were parts of that --

THE COURT: But I've taken out all of the reference to the SDGT, and that's --

MR. GONZALEZ: Yes, Judge, I think that would be correct.

THE COURT: That's what you're concerned about.

MR. GONZALEZ: Yes, Judge.

THE COURT: All right. Let's redo that.

MR. GONZALEZ: May I sit?

THE COURT: Yes, you may.

Q.    All right. I'm going to reread this to you again.

This is Count Thirty-Three.

A.      Okay, Your Honor.

Q.      Thirty-Three charges -- of the Second Superseding Indictment charges that beginning on or about January 1st of 1997 and continuing until on or about October 13, 2004, in the Western District of Missouri and elsewhere, the Defendants IARA and Mubarak Hamed did corruptly endeavor to impair and impede the due administration of the Internal Revenue laws by using the Defendant IARA's tax-exempt status to solicit funds, representing that they were legitimate charitable contributions, and to misuse part of those funds by transferring those funds to Iraq for purposes not in furtherance of the Defendant IARA's purported charitable mission.

The Defendants IARA and Mubarak Hamed continued their corrupt endeavor by omitting from IARA's IRS Forms 990 their transactions with persons and entities in Iraq, failing to disclose relevant requested information regarding the control, history, and affiliations of the Defendant IARA, making false public statements, and making false statements to agents and officials of the United States government.  All in violation of Title 26, United States Code, Section 71 -- 7212(a).

Do you understand that charge against you?

A.      Yes, Your Honor.

THE COURT: All right. I want to clarify with both the government and the defendant that I have accurately stated the information -- or the counts of the indictment that he's intending to plead guilty to.

MR. GONZALEZ: It's the government's belief you have, Judge.

THE COURT: Defendant?

MR. WOODS: Yes, Your Honor, that's correct. Thank you.

Q. Mr. Hamed, I want to make sure that you understand everything that we're doing today, so if at any point you don't understand anything that I ask you, will you agree that you will let me know that you have not understood it?

A. Yes, Your Honor.

Q. All right. And have you understood everything that we have done to this point?

A. Yes, Your Honor.

Q. You understand all three of those charges that I read to you?

A. Yes, Your Honor.

Q. Have you discussed them with your attorney before deciding how to plead here today?

A. Yes, Your Honor.

Q. All right. And has your -- have your attorneys been able to answer any questions that you had about the meaning of

these charges?

A.      Yes, Your Honor.

Q.      Do you understand that as to Count One, the conspiracy to violate the International Emergency Economic Powers Act, the maximum penalty that you are subject to is not more than five years in prison, plus a fine of $250,000 or, alternatively, a fine of not more than the greater of twice the gross gain or twice the gross loss, a three-year term of supervised release, and a $100 mandatory special assessment?

A.      Yes, Your Honor.

Q.      And do you understand that as to your -- as to Count Ten, the maximum range of punishment is not more than ten years in prison, plus a fine up to $50,000, or alternatively, in an amount not greater than twice the gross gain or twice the gross loss, a three-year term of supervised release, and a $100 mandatory special assessment?

A.      Yes, Your Honor.

Q.      And do you understand that as to Count Thirty-Three, the maximum penalty the Court may impose is not more than three years of imprisonment, a fine of $250,000, or alternatively, an amount not more than the greater of twice the gross gain or twice the gross loss, a one-year term of supervised release, and a $100 mandatory special assessment?

A.      Yes, Your Honor.

Q.      And do you understand that all of those can be run

together for a consecutive term of up to 18 years in prison?

A.      Yes, Your Honor.

Q.      And all of those fines could be aggregated, as well; in other words, all added together?

A.      Yes, Your Honor.

Q.      And if you were to violate your term of supervised release as to any of these charges, you could be put back in jail for the entire term of supervised release and receive no credit for the time you've already received in -- you've already done in jail.

A.      Yes, Your Honor.

Q.      And in addition, the Court could impose a new period of supervised release, the length of which cannot exceed three years, less the term of imprisonment imposed upon revocation of your defendant's supervised release, your supervised release.

A.      Yes, Your Honor.

Q.      How old are you, Mr. Hamed?

A.      Fifty-three.

Q.      And tell me your educational background.

A.      I have a Ph.D. -- I have a Ph.D. in agricultural economics from the University of Missouri-Columbia.  I have a Master's Degree in economics from the University of Missouri-Columbia, and I have a Master's Degree in Community Development from the University of Missouri-Columbia; and I have a Master's Degree in agricultural economics from the

University of Missouri-Columbia, and I have a Bachelor's Degree in agriculture from the University of Khartoum, Sudan.

Q.      Do you read, write, and understand the English language?

A.      Yes, Your Honor.  Yes, I do read and write English language, but also I have -- I'm not born here.  I came in 1990.  So sometime the thinking or reading things, maybe I do it a different way.

Q.      But you have been able to obtain these advanced degrees at the University of Missouri-Columbia while you were living here since 1990?

A.      Yes, Your Honor, I did.  And I had -- all of them I wrote thesis and dissertations and being accepted by the faculty of the University of Missouri in the English language.

Q.      Thank you.  Are you under the influence of any alcohol, drugs, or medications?

A.      No, Your Honor, I don't drink.

Q.      Do you believe you are mentally competent today to decide how to plead to this charge?

A.      Yes, Your Honor.

Q.      Do you have now or have you had in the past any mental disease?

A.      No, Your Honor.

Q.      Do you understand that you have the right to plead not guilty, guilty, or nolo contendere to these charges?

A. Yes, Your Honor.

Q. By pleading guilty, you're going to be giving up a number of rights. I'm going to read a list of those rights, and when I'm done, I'm going to ask if you understand each of the rights and understand that if you plead guilty, you're going to be giving these rights away.

A. Yes, Your Honor.

Q. If you had proceeded to trial, you would have the right to be represented by a lawyer at that trial. As you know, we have appointed a lawyer for you. You are presumed innocent. You would have a jury trial. Do you understand what a jury trial is?

A. Yes, Your Honor.

Q. The prosecutor would have the burden to prove you guilty beyond a reasonable doubt. You would have a right to call your own witnesses, as well as the right to confront and cross-examine witnesses against you, to present any defenses to the charges against you, and to use the subpoena power of the Court to secure witnesses. The jury's verdict would have to be unanimous, you would not be compelled to testify against yourself, and you would have the right to appeal on the merits of your case. Do you understand each of these rights?

A. Yes, Your Honor.

Q. I know you come from a different background.

A. Yes.

Q.     But you are familiar with these rights that you are given by our United States Constitution?

A.     Yes, Your Honor.

Q.     Have you talked to your attorneys about your rights?

A.     Yes.

Q.     Have they been able to answer any questions that you had about your rights?

A.     Yes, Your Honor.

Q.     Do you understand that if you decide to plead guilty here today and tell me under oath that you did what you're charged with in Counts One, Ten, and Thirty-Three that you will be giving up all of those rights?

A.     Yes, Your Honor.

Q.     Now, it's my understanding you have entered into a plea agreement in this matter.  Is that correct?

A.     Yes, Your Honor.

Q.     All right.  Do you have a copy of that plea agreement there on the rail in front of you?

A.     Yes, Your Honor.

Q.     If you will please pick up that plea agreement and turn to the last page of the plea agreement, the very last page. And tell me if that is your personal signature above the line for Mubarak Hamed.

A.     Yes, Your Honor.

Q.     Mr. Hamed, had you read everything in this plea

agreement before you signed it?

A.      Yes, Your Honor.

Q.      And had you gone over it with your attorney?

A.      Yes, Your Honor.

Q.      Did you understand everything in this plea agreement before you signed it?

A.      Yes, Your Honor.

Q.      Did you sign it voluntarily of your own free will?

A.      Yes, Your Honor.

Q.      Do you understand that this plea agreement is between you and the United States government, the Court is not bound by this plea agreement?

A.      Yes, Your Honor.

Q.      I'm not a party to it, and if I decide to approve it, then, in fact, I'm bound to it, but otherwise I can sentence you as I believe is appropriate under the law.  Do you understand that?

A.      Yes, Your Honor.

Q.      Do you understand that in sentencing you, I must consider the federal sentencing guidelines, but that I may also take into account other factors, as well?

A.      Yes, Your Honor.

Q.      Therefore, nobody, including me, can tell you what your sentence is going to be in this matter.  Do you understand that?

A.      Yes, Your Honor.

Q.      In some cases I can depart upward from the guidelines, and in some cases I might depart downward from the guidelines. Do you understand that?

A.      Yes, Your Honor.

Q.      Therefore, any guideline calculation in the plea agreement is not binding on the Court.

A.      Yes, Your Honor.

Q.      Have any promises been made to you about what I will or will not do in your case?

A.      I don't think so.  No.  No, Your Honor.

Q.      Okay.  As far as you're concerned, are there promises that are being made to you --

A.      No, Your Honor.

Q.      -- about what I will or will not do?  This is very important.  Do you understand -- it's all very important, but this is especially important.

        Do you understand that if you plead guilty here and tell me under oath that you did what you're charged with in Count One, Ten, and Thirty-Three, you won't be able to come back and change your mind?

A.      Yes, Your Honor.

Q.      You will not have the right to withdraw your plea of guilty and start over; do you understand that?

A.      Yes, Your Honor.

Q.      With that understanding, how do you wish to plead to Counts One, the section of Count Ten which I read to you, and Count Thirty-Three of the superseding indictment?

A.      Yes, Your Honor, I was wrong and I take the responsibility for Count One, Ten, and Thirty-Three.

Q.      Okay.  When you say take the responsibility, are you pleading guilty?

A.      Your Honor, I plead guilty to Count One, Count Ten, and Count Thirty-Three.

Q.      All right.  And Count Ten is limited to the specific instance that I read at the beginning of these proceedings.

A.      Yes, Your Honor.

Q.      Have you been coerced in any way or by any person to plead guilty?

A.      No, Your Honor.

Q.      Have you had enough time to talk to your attorney before deciding how to plead?

A.      Yes, Your Honor.

Q.      Are you satisfied with the representation you have received from your attorneys?

A.      Yes, Your Honor.

Q.      Now, you have several attorneys; is that correct?

A.      Yes, several attorneys, yes.

Q.      Are you satisfied with the representation and the work that has been done by all of your attorneys?

A.    Yes, Your Honor, for this plea.

Q.    Well, I need to know -- I don't want to hear later on that if I knew something else, if my attorney had told me something else, I would never have done this.  I want to know whether you're satisfied with your attorneys or you're not satisfied with your attorneys.

A.    Now I am satisfied, Your Honor.

Q.    You feel that you have everything that you need to be able to make an informed decision about whether to plead guilty or not guilty here today to these charges; is that correct?

A.    Yes, Your Honor.

Q.    And that there's nothing else that your attorneys need to do or needed to do for you to be able to make that decision.

A.    No, Your Honor, I was well-informed.

Q.    I'm sorry?

A.    I am well-informed.

Q.    All right.

        THE COURT:  All right.  What would be the evidence if this matter had proceeded to trial?

        MR. GONZALEZ:  Mr. Mohlhenrich will summarize the facts, Judge.

        THE COURT:  Mr. Hamed, I want you to listen to this because when I'm done, I'm going to ask you whether the facts he stated are true.

        THE DEFENDANT:  Yes, Your Honor.

MR. MOHLHENRICH:  The statement of facts in this case runs for six pages from Pages 2 to Page 7 of the agreement.  And the defendant's read and understands and agrees with all of those facts, as indicated by his initials on each page of the plea agreement.  I'm going to summarize the facts that are pertinent to the counts that he's charged with that he's pleading guilty to, rather than read the entire basis.

THE COURT:  Is it correct, though, that he -- I don't have the original copy -- he has initialled each one of these factual pages?

MR. MOHLHENRICH:  Yes, Your Honor.

THE COURT:  All right.

MR. MOHLHENRICH:  Mr. Hamed, those are your initials on each of those pages of the plea agreement, correct?

THE WITNESS:  Yes.

MR. MOHLHENRICH:  The defendant is a native of Sudan and a naturalized U.S. citizen.  He first entered the United States in 1990 and lived in Columbia, Missouri, from then until the present.

From 1991 onward, he was the Chief Executive of the IARA, the Islamic American Relief Agency, an Islamic charitable organization incorporated under Missouri law in 1985.  Originally, it was incorporated under the name Islamic African Relief Agency, United States Affiliate, or USA.  In 1987, IARA applied for recognition of tax exemption under Section

501(c)(3) of the Internal Revenue Code, and on April 21, 1989, it was granted.

IARA was part of an international organization having more than 40 international offices, which was headquartered in Khartoum, Sudan. That organization was known as the Islamic African Relief Agency, also known as the Islamic Relief Agency, and also known by the acronyms of IARA and ISRA.

In 1991, the defendant was appointed as Chief Executive Officer of IARA in Columbia. His title was later changed to Executive Director. As such, he ran the day-to-day operations of IARA. He was responsible for implementing projects authorized by the Board of Directors and with which the organization was associated. He negotiated and entered into cooperation agreements and contracts on behalf of IARA and authorized spending in payment for projects, materials, and travel. As a charity, IARA took in between one million and three million in contributions annually from 1991 to 2003. It also received funds from the United States Agency for International Development. During the defendant's tenure, IARA employed approximately six full-time employees and an additional ten to twelve part-time employees.

Now, pursuant to the authority granted in the Emergency -- in the International Emergency Economic Powers Act, or IEEPA, on August 2nd of 1990, the president of the United States issued Executive Order 12722, which declared a

national emergency with respect to the country of Iraq. And on August 9th of 1990, he issued Executive Order 12724, which empowered the Secretary of the Treasury to promulgate regulations to effect the executive orders.

Pursuant to this authority, the Secretary of the Treasury issued the Iraqi Sanctions Regulations, 31 C.F.R. 575, which prohibited, among other things, a United States person from sending or transferring money, funds, or goods, directly or indirectly, to any person in the country of, or to the government of, Iraq. It also prohibited the unauthorized export of goods from the United States to a third country for reshipment to Iraq, and any transaction which avoids or evades the Iraqi Sanctions Regulations. These sanctions continued in effect until May 23rd of 2003.

At all times while the Iraqi sanctions were in place, the defendant and IARA were United States persons. Further, at no time while the Iraqi sanctions were in place did the defendant or IARA have a license or any other legal authorization to send money, funds, or items into Iraq.

As part of his duties as IARA's Executive Director, the defendant was directly responsible for implementing IARA's participation in all projects and activities and authorizing all spending, which included checks and monetary transfers. It was also the defendant's responsibility to ensure that IARA had all necessary licenses and permissions to lawfully perform its

business.

As Executive Director of IARA, the defendant was aware of and caused IARA to raise money for the transfer to persons in Iraq. In that regard, in 1996, he hired the Defendant Ahmad Mustafa as a fund-raiser with the understanding that he would concentrate his efforts on raising funds for Iraq.

Hamed explained to Mustafa and other IARA employees that the moneys collected for Iraq would be transferred via wire transfer to Defendant Khalid Al-Sudanee, who was in charge of the Amman, Jordan, branch of ISRA. Al-Sudanee would either take the cash sent or purchase items in Jordan and transport them into Iraq. Correspondence found in the IARA offices and at the defendant's home confirmed that during the time the Iraqi sanctions were in effect, funds were regularly sent to Al-Sudanee in Amman, Jordan, and that Al-Sudanee took the money, funds, and items into Iraq.

On March 21st of 2001, the defendant was sent and received a letter from the Office of Foreign Assets Control in the Department of the Treasury, or OFAC, that, among other things, informed the defendant there was a report based in part on information on IARA's website that IARA appeared to be providing aid to persons inside Iraq and that there was a licensing requirement to send aid to Iraq, and that IARA did not possess a license.

The letter asked for an accounting of IARA's efforts in Iraq and Sudan for the preceding five years and a response within 20 days.  The defendant did not respond, and on August 1st of 2001, OFAC again sent him a letter with basically the same substance.  Hamed responded to this letter on August 17th of 2001 and knowingly and falsely stated to OFAC that IARA did not provide aid to anyone in Iraq and only to persons outside of Iraq.

Prior to March 21, 2001, the defendant had authorized and approved of all transfers of funds to Al-Sudanee, knowing that the money and funds would be transferred from Jordan to Iraq.  And after March 21, 2001, the defendant continued to transfer money and funds from IARA accounts in Columbia, Missouri, to Iraq through Amman, Jordan, including, but not limited to, on December 18th of 2001, the defendant authorized the transfer of $40,974.09 from an IARA account in Columbia, Missouri, to an account controlled by Al-Sudanee in Amman, Jordan, which money was to go for and to persons inside Iraq as charged in Count Ten of the Second Superseding Indictment.

On October 13th, 2004, IARA, along with five individuals in the ISRA network located overseas, was designated as Specially Designated Global Terrorists by OFAC. From that point on, IARA could no longer receive contributions or use any of its property.  The defendant was interviewed by

federal agents on October 13, 2004. The defendant acknowledges that the government could establish at trial that, during that interview, he first admitted sending money to Iraq, and then denied sending it. Further, the defendant acknowledges that the government could also establish at trial that he told Defendant Mustafa to deny that the aid had been sent into Iraq. Hamed acknowledges that the government could establish through evidence of these acts that he attempted to obstruct and impede the investigation. Later on in that day and in the following weeks, the defendant admitted to others that IARA did send money, funds, and items inside Iraq and that he did not get the required licenses.

During the entire period in which the sanctions were in effect, IARA and Hamed used the funds received as charitable contributions to engage in the prohibited transactions involving Iraq as alleged in Counts Two through Twelve and Fourteen through Twenty-Four of the Second Superseding Indictment.

Regarding Count Thirty-Three, one mission of the IRS was to oversee the operation of organizations exempt from income tax under Section 501(c)(3) of the Internal Revenue Code. In accomplishing this mission, the IRS relied primarily upon information reported annually by each tax-exempt organization on IRS Forms 990, Returns of Organizations Exempt From Income Tax, that detailed the organization's income,

expenses, and activities during the calendar year. Additionally, in determining the organization's entitlement to tax-exempt status, the IRS utilized information provided by tax-exempt organizations in response to specific inquiries, information provided by other federal agencies and state agencies, and members of the public.

By pleading guilty to Count Thirty-Three, the defendant admits that beginning at least as early as January 1st of 1997 and continuing until October 13th, 2004, he corruptly endeavored to impair and impede the due administration of the Internal Revenue laws by using IARA's tax-exempt status to solicit funds, representing that they were legitimate charitable contributions, and to misuse part of those funds by transferring those funds to Iraq, a purpose prohibited by law as alleged in the indictment.

In fact, during the entire period in which the Iraq sanctions were in effect, the defendant and IARA solicited donations through various means, including pamphlets, flyers, newsletters and personal correspondence requesting contributions for Iraq, and in many cases referencing IARA's tax-exempt status. Further, IARA and the defendant accepted monetary contributions specifically designated for projects in Iraq.

Further, the defendant admits that he continued the corrupt endeavor by omitting from IARA's IRS Forms 990

relevant, material information regarding IARA's transactions with persons and entities in Iraq, and regarding IARA's control, history, and affiliations. From 19 -- for each year from 1997 through 2003, the defendant filed or caused to be filed IRS Forms 990. On each such form, which required in Part III, Statement of Program Service Accomplishments, that they detail all of their exempt purpose expenses, the defendant knowingly failed to disclose that he and IARA had provided funds for projects and persons in Iraq.

Further, on each such form, in response to Question 80a which asked, "Is the organization related, other than by association with a statewide or nationwide organization, through common membership, governing bodies, trustees, officers, et cetera, to any other exempt or nonexempt organization," the defendant falsely answered no and failed to disclose IARA's relationship to the Islamic Relief Agency, ISRA, also known as the Islamic African Relief Agency, headquartered in Khartoum, Sudan, and to the ISRA branch office located in Amman, Jordan.

Further, the defendant admits that as part of his corrupt endeavor, on or about November 6, 2001, he instructed a spokesperson for IARA to engage in a television interview to falsely claim that a certain individual had never been an employee of IARA when, in fact, the defendant had personally hired that individual as an IARA employee. The defendant

admits that he instructed the spokesperson to falsely deny the association so as to avoid IARA coming under increased scrutiny from the government and public and to avoid deterring potential donors from contributing to IARA.

Finally, the defendant admits that on October 13, 2004, during an interview with agents of the IRS, he falsely stated that they had not transferred funds to Iraq while the sanctions were in effect and that the funds were only used for Iraqi refugees located in Jordan.  Further, to conceal the true nature of IARA's relationship with ISRA, the defendant falsely stated that he had applied for a job with IARA in Columbia, Missouri, and did not disclose that on or about April 18th of 1990, he had been transferred by the entity located in Khartoum, Sudan, to the Columbia, Missouri, branch office.

The defendant admits that the United States could have established all of these facts at trial through competent evidence.

Q.     And, Mr. Hamed, are all of those facts true?

A.     Your Honor, for Tax Form 990, I did not prepare it, but I endorsed it, and I take full responsibility for it.

Q.     But my question is are all of the facts that were just read to you true?

A.     I accept them.

Q.     Well, they're either true or not true.  If they're not true, then we'll proceed.

A.    They are true.

THE COURT:  All right.  What's the government's position as to why a plea agreement was entered into in this matter?

MR. GONZALEZ:  By the government?

THE COURT:  Uh-huh.  And then I'm going to ask the defendant.  I want to evaluate it before I accept it.

MR. GONZALEZ:  Judge, I believe that on behalf of the United States, we thought that it was a proper disposition acknowledging the defendant's illegal conduct.  The particular circumstances of the plea also would significantly shorten the trial, and we believe that just the type of plea it is, it would also be of some assistance to the United States in further proceedings.  We believe the plea agreement itself, along with the dismissed counts, accurately describes his conduct, his illegal conduct.

THE COURT:  Okay.  Could I have the parties approach, please?

MR. GONZALEZ:  Yes.

(Counsel approached the bench and the following proceedings were had:)

THE COURT:  I have either called the marshal's office or the white noise isn't working.  We'll whisper.

I don't know how you want me to handle the issue about his -- the other people in the courtroom, some of them

representing the other defendants.

MR. WOODS: Yes.

MR. GONZALEZ: I think they don't care if they find out about, if co-counsel does, that he's cooperating.

MR. SWIFT: The specifics of the agreement should be under seal, but the fact of the agreement we're comfortable with having it known. Especially with the defendants who are left, I don't think he faces a substantial threat. The fact of it, but the substance of it should be under seal.

MR. GONZALEZ: Judge, our concern is, of course -- of course, while -- and I think counsel already asked, and we let them know that he's cooperating. We just didn't want to publish it because of other things which he may be able to do in order to assist.

THE COURT: Okay.

MR. WOODS: That's satisfactory, Your Honor. Thank you.

(The following proceedings were had in open court:)

Q.    And, Mr. Hamed, do you agree that the terms of your written plea agreement, together with any written supplemental agreement that might be presented to the Court in camera, constitute the entire plea agreement between the parties and that any other terms and conditions not expressly set forth therein do not constitute any part of the parties' agreement and will not be enforceable against either party?

A.      Yes, Your Honor.

Q.      And you have made all of these decisions freely?

A.      Yes, Your Honor.

THE COURT:  All right.  Anything further for the government?

MR. GONZALEZ:  I have nothing further, Your Honor.

THE COURT:  Anything further for the defendant?

MR. WOODS:  No, Your Honor.

THE COURT:  All right.  Mr. Hamed, you may step down.

The Court accepts the defendant's plea of guilty to Counts One, Ten, and Thirty-Three of the Second Superseding Indictment.  I order a presentence investigation to be completed.  The Court finds that the defendant --

One question, Mr. Hamed.  Did you understand everything that we did here today?

THE DEFENDANT:  Yes.

THE COURT:  All right.  Thank you, sir.

The Court finds that the defendant understands the charges against him and the consequence of his plea.  The defendant has been advised of his rights, understands them, and voluntarily and intelligently waives those rights.  The defendant has been ably and competently represented by his attorneys, plural.  The defendant suffers from no mental disease or defect now or at the time the crime was committed.

The defendant's decision to plead guilty has been made freely and voluntarily and without coercion.  The defendant's decision to plead guilty has been made -- there is a factual basis for the plea, and beyond a reasonable doubt the defendant is guilty of the crime charged.

Is there any objection to the continuation of bond in this matter on the same conditions previously imposed?

MR. GONZALEZ:  No, Your Honor.

THE COURT:  All right.  The same conditions that have previously been imposed, you will continue to be under the supervision of our pretrial and probation office.  Anything further for the defendants?

MR. WOODS:  No, Your Honor, thank you.

THE COURT:  All right.  Anything further?  Have we taken care of everything?  I don't want to make a mistake here.

MR. GONZALEZ:  I think we have.

THE COURT:  Okay.

MR. GONZALEZ:  And it obviously wasn't the marshals you called, by the way.

THE COURT:  No, because he's already here.  Or they're very slow.

MR. GONZALEZ:  Yeah, hopefully not.

THE COURT:  All right.  Thank you.  Thank you all very much.  Court's in recess.

(Hearing adjourned.)

- - -

- - -

## CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

March 1, 2017

/s/_____
Kathleen M. Wirt, RDR, CRR
U.S. Court Reporter